ACCEPTED
03-13-00762-CV
6618114
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/24/2015 11:22:43 AM
JEFFREY D. KYLE
CLERK

**CAUSE NO. 03-13-00762-CV**

_____

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/24/2015 11:22:43 AM
JEFFREY D. KYLE
Clerk

FAKHREALAM ATIQ,

Appellant,

v.

COTECHNO GROUP, INC.

Appellee.

_____

**MOTION FOR EN BANC RECONSIDERATION**

_____

On Appeal from the 207th Judicial District Court of Hays County, Texas

_____

Tracy J. Willi
Texas State Bar No. 00784633
Willi Law Firm, P.C.
9600 Escarpment Blvd., Ste. 745, PMB 34
Austin, Texas 78749
Tel. (512) 288-3200
Fax (512) 288-3202
twilli@willi.com

ATTORNEY FOR APPELLEE,
COTECHNO GROUP, INC.

# TABLE OF CONTENTS

I. SUMMARY OF THE ARGUMENT. ..............................................................1

II. FACTS IN THE COURT'S OPINION ARE INTERNALLY INCONSISTENT. ..............................................................1

III. FRAUDULENT INDUCEMENT WAS PLEADED AND PROVED SUFFICIENTLY TO SUPPORT THE TRIAL COURT'S RULING. ..............................................................3

IV. THE DOCTRINES OF ALTER EGO OR SHAM CORPORATION ARE AVAILABLE TO HOLD ATIQ PERSONALLY RESPONSIBLE FOR HIS FRAUDULENT ACTIONS IN TEXAS. ..............................................................4

V. THE COURT'S OPINION MISAPPLIES THE *PHC-MINDEN* CASE. ..............................................................7

VI. CONCLUSION AND PRAYER. ..............................................................10

# INDEX OF AUTHORITIES

**Cases**

*Alliance Royalties, LLC v. Boothe*,
  326 S.W.3d 117 (Tex. App.—Fort Worth 2010, no writ) ....................................3

*BMC Software Belg., N.V. v. Marchand,*
  83 S.W.3d 789 (Tex. 2002)...............................................................................9

*Daimler-Benz Aktiengesellschaft v. Olson,*
  21 S.W.3d 707 (Tex. App.—Austin 2000, pet. dism'd w.o.j.), cert. denied, 535
  U.S. 1077 (2002) ...............................................................................................8

*Haase v. Glazner*,
  62 S.W.3d 795 (Tex. 2001)................................................................................7

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
  341 S.W.3d 323 (Tex. 2011)..............................................................................7

*Jones v. Beech Aircraft*,
  995 S.W.2d 767 (Tex. App.—San Antonio 1999, pet. dism'd w.o.j.) .................8

*Max Protetch, Inc. v. Herrin*,
  340 S.W.3d 878 (Tex. App.—Houston [14th Dist.] 2011, no pet.).....................4

*PHC-Minden, L.P. v. Kimberly-Clark Corp.*,
  235 S.W.3d 163 (Tex. 2007)..............................................................................7

*Proppant Solutions, LLC v. Delgado*,
  No. 01-14-00800-CV (Tex. App. [1st Dist.] July 14, 2015, np pet. h.) ...............8

*Silkwood v. Kerr-McGee Corp.*,
  485 F.Supp. 566 (W.D. Okla. 1979)..................................................................10

*Spoljaric v. Percival Tours, Inc.*,
  708 S.W.2d 432 (Tex. 1986)..............................................................................7

<u>**MOTION FOR EN BANC RECONSIDERATION**</u>

CoTechno Group, Inc., Appellee, files this Motion for En Banc Reconsideration pursuant to and would show this Court as follows.

## I.     Summary of the argument.

The trial court in this case entered an order denying Appellant's special appearance on October 23, 2013.  On July 9, 2015, this Court issued an opinion reversing the trial court's decision.  The Court's opinion is in error because some of the facts relied upon in the Court's opinion are internally inconsistent with other facts stated in the Court's opinion, and deference should be given to the trial court's implied fact findings.  Also, the Court's opinion is in error because its legal conclusions do not follow from the facts stated in the opinion.

## II.     Facts in the Court's opinion are internally inconsistent.

This Court's opinion agrees that Atiq's contacts prior to the incorporation of C-Fabrics are the actions of Atiq personally for purposes of analyzing jurisdiction.  Op. at 11 (Appx. 1, attached).  This Court's opinion also agrees that CoTechno claims that Atiq committed fraud by entering into the Future Business Agreement because he personally never intended to honor the agreement.  Op. at 10.  "Under this analysis, the undisputed evidence supports CoTechno's allegation that Atiq, in his personal capacity, entered into the Future Business Agreement with Fiberex and CoTechno, a Texas resident.  Consequently, to the extent Atiq conducted business in Texas under the Agreement on behalf of C-Fabrics prior to its incorporation, we would also impute those contacts to Atiq personally."  Op. 12.  Even though the Court finds that Atiq's actions in 2009 prior

to the formation of C-Fabrics were Atiq's own personal actions, the Court's opinion also states exactly the opposite: "according to Atiq's undisputed affidavit, his travel to Texas in 2009 was solely in his capacity as an officer of Fiberex." Op. at 12, n. 5. This is an internally inconsistent finding of fact in the Court's opinion. The fact of whether Atiq traveled to Texas in 2009 "solely in his capacity as an officer of Fiberex" is certainly disputed, even within the Court's opinion. The trial court's implied fact finding on this issue should be given deference.

The Court's opinion acknowledges that "CoTechno also claimed that Atiq was a party to the Future Business Agreement in his personal capacity and that he and Fiberex had fraudulently entered into the Agreement with CoTechno and then breached the Agreement by failing to transfer C-Fabrics." Op. at 3. More particularly, CoTechno pleaded and presented evidence that Atiq fraudulently induced CoTechno into entering into a partnership, the Future Business Agreement, by making several misrepresentations to CoTechno during his meeting in Texas with CoTechno in 2009:

> In the summer of 2009, Fakhrealam Atiq came to San Marcos, Texas, to meet with me and discuss future business relationships between our companies, Cotechno Group, Inc. ("Cotechno") and Fiberex Glass Corporation, Inc. ("Fiberex"), respectively. We discussed short and long term goals and ultimately agreed to enter into a partnership. Atiq drafted the partnership agreement. There were several key provisions, which I relied on when entering into the contract on behalf of Cotechno. Atiq promised to form a new company called Cotechno Fabrics, Inc. ("Cofab"). He further promised that all of the figerglass shipped to the CoTechno warehouse would remain the property of Cofab until it was sold and delivered to our customers. Atiq promised that Cofab would be a wholly owned subsidiary of Fiberex. Finally, he promised to transfer Cofab to Cotechno upon repayment of a deemed "debt" and payment of $1.00.

> Following our discussion in San Marco, Atiq drafted the Future Business Agreement and, in August of 2009, signed it on behalf of Fiberex and purportedly

2

on behalf of Cofab. Based on the promises in the Future Business Agreement, my wife and I signed on behalf of Cotechno.

CR 122, Affd. of Alex Apostol (attached to CoTechno's Response to Atiq's Special Appearance).

## III. Fraudulent inducement was pleaded and proved sufficiently to support the trial court's ruling.

The Court's opinion states that "CoTechno also argues that Atiq traveled to San Marcos in 2009, prior to the execution of the Agreement, to meet with CoTechno about the proposed contract and during that meeting fraudulently induced CoTechno to enter into the contract." Op. at 17, n. 7. But then this Court's opinion contends that this claim was insufficiently pleaded. *Id.* This matter was clearly stated in the pleadings and in the responses to the special appearance. *See* CR 68, 122 (quoted above), 240.

> Fiberex and Atiq represented to Cotechno that Cofab existed and was a wholly owned subsidiary of Fiberex. Further, Atiq and Fiberex represented that upon payment of the deemed "debt" and payment of $1.00, Cofab would be transferred to Cotechno. These representations were false at the time they were made and further, both Atiq and Fiberex knew they were false and had no intention of honoring them. Their intention is evidenced by the fact that Cofab never issued any stock to Fiberex, Cofab did not exist in August 2009 and Fiberex and Atiq have never had any intention of transferring Cofab.

CR 68.

CoTechno's pleadings for purposes of asserting jurisdiction include its amended petitions as well as the response to the special appearance. *Alliance Royalties, LLC v. Boothe*, 326 S.W.3d 117, 120 (Tex. App.—Fort Worth 2010, no

3

writ); *Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 883 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

**IV.    The doctrines of Alter Ego or Sham Corporation are available to hold Atiq personally responsible for his fraudulent actions in Texas.**

Atiq, as a partner in the FBA, used CoTechno Fabrics, Inc. as a sham and to perpetrate a fraud against CoTechno Group, Inc.   As demonstrated from the representations made to CoTechno in Texas and later reduced to writing by Atiq in the Future Business Agreement, CoTechno alleges that Atiq fraudulently induced CoTechno Group, Inc. to provide use of its tradename "CoTechno," to obtain confidential information from CoTechno, to obtain customer lists, and to operate CoTechno Group in a manner that provided profits to Atiq's company, Fiberex, all with the false promises that Atiq would form an operating entity that would be transferred to CoTechno Group, Inc. after the alleged debt was paid.   CR 73-78. Instead, Atiq never intended to form an operating entity and did not intend to transfer any entity to CoTechno Group, Inc.

The evidence in Apostol's affidavit, stated above, demonstrates that Atiq personally injected himself, as an individual separate and apart from Fiberex, as a party to this agreement formed in Texas.   He undertook a personal obligation to form a new company, C-Fabrics, that he would operate in a certain manner.   He never intended to do what was stated in this agreement.   The Court's opinion misses the fact that Atiq's alleged fraud occurred during his personal meeting with CoTechno in Texas in 2009

4

when he made his misrepresentations to fraudulently induced CoTechno to enter into the Future Business Agreement.

The Court's opinion errs when it combines the jurisdictional analysis for breach of contract, breach of fiduciary duty, and fraud together. Op. at 13. If this Court considered fraudulent inducement as a separate claim, it would find that Atiq's attendance at the 2009 meeting in Texas, wherein he made misrepresentations which induced CoTechno into signing the Future Business Agreement, is a significant contact with Texas directly giving rise to the claim.

Atiq's fraud continued when he formed C-Fabrics, which he admitted in testimony, was simply an alter ego or a sham corporation. In other words, C-Fabrics involvement was simply the continuation of Atiq's personal involvement in this transaction. When asked to describe the nature of CoTechno Fabrics, Inc., Atiq testified, "I don't know. I don't know. **I told you it is only a vehicle, an empty shell. It has no tasks.**" Resp. Ex. 6 at p. 134. This was not an accidental statement—Atiq insisted that CoTechno Fabrics, Inc. was not a real entity, but a sham corporation:

Q: Okay. So Fiberex employees at your direction did work on CoTechno Fabrics tasks?

Mr. Schumacher: Objection, form.

A: You asked the same question again, and I'm going to answer the same way again.

Q: Okay.

**A: CoTechno Fabrics is and was a mechanism to collect a debt. It is a shell company, had nothing, no operations, nothing. It was only a vehicle.**

Q: Let me ask a little bit more specifically then.

A: Please, if you would.

Q: When CoTechno –

A: I'd be very happy to answer.

Q: Okay. When CoTechno Fabrics sent an invoice – I'm sorry, when CoTechno Group sent an invoice to CoTechno Fabrics, Fiberex employees would accept the invoice and prepare for next steps?

Mr. Shumacher: Form.

**A: I don't know how to answer that. There --- there was no employees in CoTechno Fabrics, and, again Fiberex was working to collect a debt. So, obviously, they are handling the paper work of whatever is necessary. How it handled, who did what, I don't know.**

*Id*. at 136–37.

As to the fraud claim, Apostol explained that Atiq set up the CoTechno Fabrics business without having the intent to sell it back to CoTechno as the agreement required. Apostol further testifies that, "He [Atiq] was just—basically scammed us as a sham corporation. As you can see from the discovery they provided, that [CoTechno Fabrics] was nothing but a channel to get – for him [Atiq] to get the money out of the whole thing. The stocks were never issued. He had absolutely zero intention to honor his promise in

that agreement to return CoTechno Fabrics to CoTechno Group for the dollar, whenever that happens – is to happen." (Pet. Ex. 1, p. 108.)

The elements of fraud are (1) the speaker made a material representation, (2) it was false, (3) the speaker knew the representation was false when made or made it recklessly without any knowledge of its truth and as a positive assertion, (4) the speaker made the representation with intent that the other party act upon it, (5) the other party acted in reliance on the misrepresentation, and (6) that party suffered injury thereby. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). For fraudulent inducement, the elements of fraud must be established as they relate to an inducement to enter into a contract between the parties. *See Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001). While the mere failure to perform a contract will not support a claim for fraudulent inducement, a promise to do an act in the future is actionable fraud "when made with the intention, design and purpose of deceiving, and with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434-35 (Tex. 1986).

## V.    The Court's Opinion misapplies the *PHC-Minden* case.

The Court's opinion misapplies the Texas Supreme Court's opinion in *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 176 (Tex. 2007). Op. at 18, n. 8. The *PHC-Minden* opinion was discussing the "single business enterprise" theory of imputed liability. *PHC-Minden*, 235 S.W.3d at 174. None of the multiple cases cited with parentheticals by the *PHP-Minden* opinion addressed the use of a sham corporation to perpetrate a fraud. *Id*. A case cited favorably in that opinion includes *Daimler-Benz*

7

*Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 721 n. 5 (Tex. App.—Austin 2000, pet. dism'd w.o.j.), cert. denied, 535 U.S. 1077 (2002). This court of appeals found that "Daimler-Benz and MBNA form a functional whole in promoting and marketing vehicles in Texas." *Id*. at 723. Based upon this and other factors, including the fact that the contract at issue was to be performed in Texas, this court of appeals found personal jurisdiction over *Daimler-Benz. Id*. at 726. Moreover, within the *Daimler-Benz* opinion, a discussion of the *Jones* case reflects that an entity "existing solely to funnel sales" or simply "directing customers" to another entity can support a basis for personal jurisdiction. *Daimler- Benz*, 21 S.W.3d at 721, citing *Jones v. Beech Aircraft*, 995 S.W.2d 767, 771 (Tex. App.—San Antonio 1999, pet. dism'd w.o.j.).

A recent decision by the First Court of Appeals presenting somewhat similar facts has resulted in a strong dissent by Justice Keyes and a pending Motion for En Banc Reconsideration. *Proppant Solutions, LLC v. Delgado*, No. 01-14-00800-CV (Tex. App. [1st Dist.] July 14, 2015, np pet. h.) (Motion for En Banc Reconsideration filed on July 28, 2015 is attached as Appx. 2). Plaintiff Proppant Solutions, LLC, alleged that Delgado, an owner, secretary, and Director for Administration/Finance of Defendant ChristDel Corporation, established minimum contacts with Texas that submitted her to its long-arm jurisdiction by her participation in the fraudulent inducement and fraudulent performance of the underlying agreement between ChristDel and Proppant Solutions. *Id*. at J. Keyes dissent Op. p. 2. Judge Keyes' opinion concludes that Delgado's contacts with Texas in connection with the negotiation and performance of the ChristDel/Proppant Solutions Contract are substantially connected to the operative facts of the litigation and

8

show that she clearly purposefully availed herself of the privilege and benefits of conducting business in Texas under a contract from which she personally profited. There is a substantial connection between Delgado's Texas contacts, considered collectively, and the operative facts of the litigation. *Id*. at 21, citations omitted. For two reasons, the jurisdictional case against Atiq is stronger than the case against Delgado. First, the trial court's implied fact findings *supporting* jurisdiction over Atiq should be given deference. Second, Atiq's involvement in the transactions were more substantial in that he personally negotiated the Future Business Agreement *on behalf of himself* and then participated in that agreement through C-Fabrics that was demonstrated to be simply Atiq under the fraudulent guise of a sham corporate entity.

The trial court must often resolve questions of fact before deciding the jurisdictional question. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002). Because the trial court did not issue findings of fact or conclusions of law to support its denial of the special appearance, this court presumes that all factual disputes were resolved in favor of the trial court's ruling and "all facts necessary to support the judgment and supported by the evidence are implied." *Id.* at 794-95. This Court need not, and should not, resolve conflicting evidence at this stage of the proceedings to determine whether an alter ego relationship may be found. It is enough that CoTechno presented substantial evidence that the Co-Fabric corporation was not real – it was a sham used to perpetrate a fraud. There was an implied finding of fact that Co-Fabric was merely a sham and that Atiq was the real party

9

in interest for every alleged act of Co-Fabric. It was not Co-Fabric who participated in the Future Business Agreement – it was Atiq under the guise of a sham corporation called Co-Fabric. When Co-Fabric failed to comply with the contract, it was actually Atiq who failed to comply with the contract. Since Atiq has been sued personally, there is no reason to sue Co-Fabric as well. If Co-Fabric is the alter ego of Atiq, it was sued at the same time suit was filed against Atiq. A binding determination on the alter ego question will be determined only after trial. The issue is one to be evaluated by a jury subject to appropriate instructions. *See, e.g., Silkwood v. Kerr-McGee Corp.*, 485 F.Supp. 566, 601 (W.D. Okla. 1979).

## VI.     Conclusion and Prayer.

CoTechno requests this Court to grant this Motion for En Banc Reconsideration and issue a new decision finding that the trial court's ruling denying Atiq'a special appearance should be affirmed.

Respectfully submitted,

/s/ Tracy J. Willi
Tracy J. Willi
Texas State Bar No. 00784633
Willi Law Firm, P.C.
9600 Escarpment Blvd., Ste. 745, PMB 34
Austin, Texas 78749
(512) 288-3200
(512) 288-3202 (fax)
twilli@willi.com

ATTORNEY FOR APPELLEE,
COTECHNO GROUP, INC.

## CERTIFICATE OF COMPLIANCE

In accordance with Texas Rule of Appellate Procedure 9.4, I hereby certify that this document contains 2,516 words.

/s/ Tracy J. Willi
Tracy J. Willi

11

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that this document was filed with Clerk of Court through the Court's electronic filing system ("efs") and served on all counsel of record by the same manner on August 24, 2015 or by facsimile if counsel is not registered for service through the efs, as follows:

James G. Ruiz
Andrew Schumacher
Winstead PC
401 Congress Avenue, Suite 2100
Austin, TX 78701
(512) 370-2818
(512) 370-2850 (fax)

ATTORNEYS FOR
APPELLANT, FAKHREALAM
ATIQ

Robert Tyler
Tyler & Casteel
1812 Centre Creek Dr., Suite 110
Austin, TX 78754
(512) 201-1500
(512) 201-1505 (fax)

ATTORNEY FOR APPELLEE,
COTECHNO GROUP, INC.

/s/ Tracy J. Willi

Tracy J. Willi

# Appendix 1

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-13-00762-CV
---

**Fahkrealam Atiq, Appellant**

**v.**

**CoTechno Group, Inc., Appellee**

---
### FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
### NO. 11-1626, HONORABLE R. BRUCE BOYER, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

After Fiberex Corporation sued CoTechno Group, Inc. for claims arising from a contract dispute, CoTechno filed a third-party petition against one of Fiberex's officers, Fahkrealam Atiq, a Canadian resident. Atiq then filed a special appearance, which the trial court denied. In this interlocutory appeal, Atiq contends that the trial court erred in denying his special appearance because, according to Atiq, any and all actions he took were solely in his capacity as a corporate officer. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(7); Tex. R. Civ. P. 120a. We conclude that the undisputed allegations and the evidence before us are insufficient to support personal jurisdiction over Atiq in his individual capacity. Therefore, we reverse the trial court's order and render judgment dismissing CoTechno's claims against Atiq for want of personal jurisdiction.

**BACKGROUND**

Atiq, a Canadian citizen residing in Edmonton, Alberta, is chairman and CEO of Fiberex, a Canadian corporation. According to Atiq, Fiberex "primarily offers goods and services related to the manufacture and marketing of glass fiber reinforcements for composites." Historically, Fiberex supplied its product to CoTechno, a manufacturer of glass fiber woven products with facilities located in San Marcos, Texas.

In August 2009, a dispute arose over a certain shipment of materials to CoTechno from Fiberex. In short, CoTechno claimed that Fiberex had provided defective materials, and Fiberex claimed that CoTechno owed $360,000 for its purchase of the materials. Ultimately, in an effort to settle their dispute, the companies entered into a Future Business Agreement. In part, the Agreement provided that (1) a new entity, C-Fabrics, would initially serve as a wholly owned subsidiary of Fiberex; (2) CoTechno would channel some of its business through C-Fabrics; and (3) a portion of C-Fabric's revenue would be devoted to paying down the "debt" claimed by Fiberex, in an amount negotiated by the parties. Finally, the companies agreed that once the debt was satisfied, ownership of C-Fabrics would be transferred to CoTechno for $1.

The companies operated under the Agreement for several years, and the negotiated debt amount was eventually paid off. On August 16, 2011, Fiberex sent written notice of its intention to terminate the Future Business Agreement.[1] Fiberex then filed suit in Hays County, Texas, claiming ownership of certain property—inventory, materials, and leased equipment—located

---

[1] Although the parties agree that the "debt" was eventually satisfied, the parties dispute whether CoTechno's payment of $1 on August 18, 2011, was timely and whether the payment triggered Fiberex's duty to transfer ownership of C-Fabrics.

at CoTechno's warehouse and obtained a temporary restraining order allowing Fiberex to remove the property from the facility without interference from CoTechno. In response, CoTechno filed counterclaims against Fiberex and later a third-party petition, joining Atiq as a third-party defendant.

With respect to Atiq, CoTechno alleged that Atiq had personally engaged in a variety of torts and that he had breached contractual obligations under the Future Business Agreement. Specifically, CoTechno claimed that Atiq and Fiberex converted fiberglass material that was the property of CoTechno and C-Fabrics by obtaining a temporary restraining order permitting the removal of the material. CoTechno also claimed that Atiq was a party to the Future Business Agreement in his personal capacity and that he and Fiberex had fraudulently entered into the Agreement with CoTechno and then breached the Agreement by failing to transfer C-Fabrics. Similarly, CoTechno claimed that the Agreement created a partnership between Fiberex, CoTechno, and Atiq and that Atiq breached his fiduciary duties as a partner by engaging in self-dealing. Finally, CoTechno alleged that Atiq was individually liable on all claims because he was acting as the alter ego of both Fiberex and C-Fabrics.

In response, Atiq filed a special appearance under Rule 120a of the Texas Rules of Civil Procedure, asserting that the court lacked personal jurisdiction over him. *See* Tex. R. Civ. P. 120a. Atiq attached an affidavit to his special appearance that he later introduced as an exhibit at the special-appearance hearing. In relevant part, Atiq swore to the following:

1. I am a citizen of Canada residing in Edmonton, Alberta. . . .

2. I am not and have not ever been a resident of the State of Texas. I own no property in Texas, do not have a bank account in Texas, nor do I have a mailing address or place of business in Texas. I do not engage in business in

3

Texas in my individual capacity and am not a party to any agreement performable within the State.

. . .

[3.]    In my capacity as Chairman and CEO of Fiberex, I traveled to San Marcos, Texas, once in 2009 as part of a routine customer visit to meet with the principals of CoTechno. Aside from this single trip to Hays County, my only other travels to Texas have been to Houston approximately three times in the last two years, in my capacity as an officer of a different Canadian Corporation, to visit customers of that different Canadian entity which is wholly unrelated to this litigation.

[4.]    My interactions with CoTechno and its principals were all undertaken in my capacity as an officer of Fiberex in the furtherance of the business of Fiberex, and not in my individual capacity. I was not directly involved in negotiating the Future Business Agreement ("FBA") with CoTechno. The majority of the FBA was negotiated and prepared by two other Fiberex officers at the time, Peter Bonyun and Mark Williams. However, in my capacity as Chairman and CEO of Fiberex, I did review and provide comments to the agreement during the negotiation process. Ultimately, as Chairman of Fiberex, I approved and signed the FBA on behalf of Fiberex.

[5.]    The FBA recognizes a separate corporation, CoTechno Fabrics Inc. ("C-Fabrics"), a wholly owned subsidiary of Fiberex, as a party to the agreement. C-Fabrics was incorporated under the laws of the State of California in 2009. I executed the Articles of Incorporation for C-Fabrics on August 5, 2009, and afterwards forwarded the executed Articles of Incorporation to Mr. Roger Bhatia, Fiberex's California counsel, for recording in the State of California. C-Fabrics has not maintained a place of business in Texas nor had any Texas employees at any time. Nor has C-Fabrics ever maintained a Texas mailing address or a registered agent within the State of Texas for service of process. I signed the FBA in Canada as President of C-Fabrics on August 17, 2009.

The trial court later held a hearing at which the parties submitted evidence, including Atiq's affidavit. The trial court denied the special appearance, and this appeal followed.

4

**BACKGROUND LAW**

Texas courts may assert jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *see* Tex. Civ. Prac. & Rem. Code § 17.042 (Texas long-arm statute). The Texas long-arm statute allows Texas courts to exercise personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Consequently, "the requirements of the Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal due-process limitations." *Moki Mac River Expeditions*, 221 S.W.3d at 575.

The exercise of jurisdiction over a nonresident comports with federal due process when (1) the nonresident has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013); *see International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "A defendant establishes minimum contacts with a state when [he] 'purposefully avails [himself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

The requirement of "purposeful availment" encompasses three considerations. First, a court must consider only the defendant's contacts with the forum, not the unilateral activity of another party or a third person. *Moki Mac River Expeditions*, 221 S.W.3d at 575 (citing *Michiana*

5

*Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784-85 (Tex. 2005)). In addition, the contacts on which jurisdiction is based must be purposeful. *Id*. If the defendant's Texas contacts are random, fortuitous, or attenuated, the defendant is not subject to jurisdiction in Texas courts. *Id*. Finally, the defendant must seek some benefit, advantage, or profit by availing himself of the jurisdiction of Texas. *Id*. The defendant's activities, whether they consist of direct acts within Texas or conduct outside of Texas, "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

A nonresident defendant's contacts with the forum state can give rise to either specific or general jurisdiction. *BMC Software*, 83 S.W.3d at 795. General jurisdiction exists when the defendant has made continuous and systematic contacts, such that the forum may exercise jurisdiction over the defendant even if the alleged liability does not arise from or relate to those contacts. *Id*. at 796. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, 131 S. Ct. 2846, 2853-54 (2011). In contrast, specific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's contact with the forum. *Moki Mac River Expeditions*, 221 S.W.3d at 576. When specific jurisdiction is alleged, the focus of the minimum-contacts analysis is the relationship among the defendant, the forum, and the litigation. *Id*. at 575-76 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). If the court concludes that a nonresident defendant has minimum contacts with Texas by purposefully availing himself of

6

the privilege of conducting activities here, the court must then address whether the defendant's alleged liability arises out of or is related to those contacts. *See id*. at 579 ("For specific-jurisdiction purposes, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts.").

## STANDARD OF REVIEW

Under the Texas long-arm statute, the plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the personal jurisdiction of a Texas court. *BMC Software*, 83 S.W.3d at 794. When this initial burden is met, the burden shifts to the nonresident to negate all bases of personal jurisdiction asserted by the plaintiff. *Id*. A defendant may negate jurisdiction on a legal basis by showing that even if the plaintiff's allegations are true, they do not establish jurisdiction. *Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). A defendant may also negate jurisdiction on a factual basis by introducing evidence that rebuts the allegations in the pleadings. *Id*. Only relevant jurisdictional facts, rather than the ultimate merits of the case, should be considered in deciding the issue of jurisdiction. *Moncrief Oil Int'l*, 414 S.W.3d at 156.

When, as in this case, the trial court does not issue findings of fact and conclusions of law, all facts necessary to support the judgment and supported by the evidence are implied. *BMC Software*, 83 S.W.3d at 795. When the appellate record includes the reporter's record and clerk's record, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id*. The ultimate determination of whether a court has personal jurisdiction over a defendant is a question of law that we review de novo. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 150.

7

Because specific jurisdiction requires that the claim arise out of or result from the defendant's forum contacts, we analyze whether jurisdictional contacts support specific jurisdiction on a claim-by-claim basis unless the claims arise from the same forum contacts. *Id*.

## ANALYSIS

On appeal, Atiq asserts that CoTechno's "jurisdictional allegations are both factually and legally insufficient to establish personal jurisdiction over Atiq." Specifically, Atiq argues that "all of the complained of acts alleged to have been committed by Atiq were done in Canada in his representative capacity as an officer of Fiberex or C-Fabrics" and that under the fiduciary-shield doctrine none of these business contacts may be imputed to Atiq individually. According to Atiq, because the evidence shows that Atiq had no contacts with Texas in his individual capacity, the claims against him should be dismissed for lack of jurisdiction.

Under the fiduciary-shield doctrine, a nonresident corporate officer or employee is protected from the exercise of jurisdiction when all of that individual's contacts with the forum state were made on behalf of his employer.[2] *Tabacinic v. Frazier*, 372 S.W.3d 658, 668 (Tex.

---

[2] Courts that have applied the fiduciary-shield doctrine have generally limited its application to the exercise of general jurisdiction over a nonresident defendant. *See Tabacinic v. Frazier*, 372 S.W.3d 658, 668 (Tex. App.—Dallas 2012, no pet.); *Ennis v. Louisea*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.). One court of appeals, however, has recently questioned and rejected this limitation. *See Stull v. Laplant*, 411 S.W.3d 129, 138 (Tex. App.—Dallas, 2013 no pet.). In that case, the plaintiffs asserted that the fiduciary-shield doctrine did not apply to their claim of breach of contract based on specific jurisdiction. *Id*. at 135-36. The Dallas Court of Appeals rejected the notion that the fiduciary-shield doctrine applies only to general-jurisdiction analysis and held that "even if a plaintiff asserts only specific jurisdiction regarding an alleged breach of contract against a non-resident agent of the contracting party, the agent's contacts with Texas in furtherance of the principal's business are attributable only to the employer, not to the agent, because the fiduciary shield doctrine applies." *Id*. at 138. Similarly, in this case, CoTechno argues that specific jurisdiction

App.—Dallas 2012, no pet.); *see Morris v. Kohls-York* , 164 S.W.3d 686, 698 (Tex. App.—Austin 2005, pet. dism'd) (noting that courts of appeals have recognized fiduciary-shield doctrine, although supreme court has not explicitly adopted it). The fiduciary-shield doctrine, however, does not protect a corporate officer or employee from an assertion of personal jurisdiction when the opposing party has alleged intentional torts or fraudulent acts for which he may be held individually liable. *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.); *see Stull v. Laplant*, 411 S.W.3d 129, 135 (Tex. App.—Dallas 2013, no pet.). This is because a "corporate officer is primarily liable for his own torts." *Morris v. Powell*, 150 S.W.3d 212, 221 (Tex. App.—San Antonio 2004, no pet.). Similarly, the fiduciary-shield doctrine does not protect an individual from the exercise of jurisdiction based on claims of piercing the corporate veil. *Stull*, 411 S.W.3d at 135. "There is no blanket protection from jurisdiction simply because a defendant's alleged acts were done in a corporate capacity." *SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied).

Despite Atiq's assertion that he was at all times acting in a corporate capacity, CoTechno contends that Atiq is subject to personal jurisdiction in his individual capacity for three reasons. First, CoTechno contends that Atiq's contacts arising from the Future Business Agreement represent his personal contacts because, according to CoTechno, Atiq was not acting on behalf of a corporation when he signed the Agreement. CoTechno claims that "Atiq personally breached the

exists with respect to its breach-of-contract and tort claims against Atiq. However, we need not decide whether the fiduciary-shield doctrine generally applies to CoTechno's claims of specific jurisdiction. As we will explain, even if Atiq's actions are fairly attributable to him in his individual capacity, CoTechno has not established sufficient contacts to confer jurisdiction over Atiq in Texas.

9

[Future Business Agreement] by, inter alia, breaching the provision on ownership of fiberglass by claiming that Fiberex was the owner of fiberglass at CoTechno's warehouse, by failing to comply with the termination provisions, and by failing to transfer ownership of [C-Fabrics] to [CoTechno]." Second, CoTechno claims that "Atiq has committed actionable torts, in whole or in part in Hays County, Texas" for which he is personally liable, including fraud, breach of fiduciary duty, and interference with business relationships. Third, CoTechno argues that the fiduciary-shield doctrine does not apply because C-Fabrics and Fiberex were operating as the alter ego of Atiq. We will address each of CoTechno's assertions in turn.

**The Future Business Agreement**

We first examine CoTechno's assertion that Atiq signed the Future Business Agreement in his personal capacity. In its live pleadings, CoTechno asserts that Atiq is personally liable under the Agreement because Atiq signed the Agreement as an individual. Specifically, CoTechno alleges that, although Atiq purported to sign the Agreement on behalf of Fiberex, as CEO and President, and on behalf of C-Fabrics, as CEO and President, C-Fabrics had not yet been formed and therefore was not in existence at the time of signing. Further, CoTechno alleges that, as a result of the Agreement, a partnership was formed between Fiberex, CoTechno, and Atiq. CoTechno's allegation that Atiq entered into the Agreement in his individual capacity serves as the basis for three of CoTechno's causes of action: (1) that Atiq is personally liable for breach of the Future Business Agreement; (2) that Atiq beached fiduciary duties that he owed to CoTechno as partner under the Future Business Agreement; and (3) that Atiq committed fraud by entering into the Agreement because he personally never intended to honor the Agreement.

10

"When an agent negotiates a contract for its principal in Texas, it is the principal who does business in this state, not the agent." *Mort Keshin & Co. v. Houston Chronicle Publ'g Co.*, 992 S.W.2d 642, 647 (Tex. App.—Houston [14th Dist.] 1999, no pet.). However, one "cannot act as an agent of a corporation that does not yet exist." *Cagle v. Clark*, 401 S.W.3d 379, 392 (Tex. App.—Texarkana 2013, no pet.).[3] As a result, to the extent a nonresident defendant's contacts represent actions taken on behalf of an unformed corporation, the nonresident defendant's contacts with the forum are attributable to him personally in analyzing personal jurisdiction. *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 486 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that corporate officer's actions prior to incorporation subjected officer to personal jurisdiction in Texas in his individual capacity for tort claims arising out of those actions).

In this case, the special-appearance record establishes that (1) the Articles of Incorporation for C-Fabrics were executed by Atiq on August 5, 2009; (2) the Future Business Agreement was signed on or about August 17, 2009; and (3) C-Fabrics's Articles of Incorporation were filed with the California Secretary of State on September 11, 2009.[4] Therefore, we agree that Atiq's contacts prior to the incorporation of C-Fabrics—to the extent the actions would otherwise be attributable to C-Fabrics—are the actions of Atiq personally for purposes of analyzing jurisdiction. *See Cagle*, 401 S.W.3d at 392 (considering nonresident defendant's "contacts prior to

---

[3] As a result, when a purported agent enters a contract on behalf of an unformed corporation, he is personally liable on the contract, absent an agreement to the contrary with the contracting party. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 897 (Tex. App.—Fort Worth 1997, writ denied). In these circumstances, the agent is relieved of liability only when the corporation, once formed, subsequently adopts the contract either expressly or by accepting its benefits. *Id.* at 898.

[4] In California, corporate existence begins upon the filing of articles of incorporation. *See* Cal. Corp. Code § 200.

11

the formation of [the business entity] as contacts conducted in [defendant's] individual capacity"). Under this analysis, the undisputed evidence supports CoTechno's allegation that Atiq, in his personal capacity, entered into the Future Business Agreement with Fiberex and CoTechno, a Texas resident. Consequently, to the extent Atiq conducted business in Texas under the Agreement on behalf of C-Fabrics prior to its incorporation, we would also impute those contacts to Atiq personally.

Considering only Atiq's contacts in his individual capacity, however, we cannot conclude that Atiq's contacts with Texas support the exercise of specific jurisdiction with respect to CoTechno's claims related to the Future Business Agreement—breach of contract, breach of fiduciary duty, and fraud. Based on the pleaded jurisdictional facts and the evidence before us, Atiq has only a single forum contact that is related to the operative facts underlying these three claims—his execution of the Future Business Agreement.[5] To the extent the Agreement calls for performance in Texas, it expressly calls for performance only on the part of C-Fabrics and Fiberex. Further, CoTechno has not specifically alleged nor presented any evidence of performance of the Agreement by Atiq after execution of the Agreement but prior to C-Fabrics's incorporation. For example, CoTechno has not alleged or presented evidence that during this four-week time period Atiq shipped materials to Texas, marketed to Texas, established an office in Texas, or otherwise conducted business in Texas under the Agreement.

_____

[5] CoTechno also argues that Atiq traveled to San Marcos in 2009, prior to the execution of the Agreement, to meet with CoTechno about the proposed Agreement. To the extent CoTechno generally relies on this 2009 trip as a contact that was made by Atiq on behalf of C-Fabrics prior to its incorporation, we conclude that CoTechno has not specifically pleaded that this trip was undertaken on behalf of C-Fabrics and there is no evidence that would support such an implied finding. Instead, according to Atiq's undisputed affidavit, his travel to Texas in 2009 was solely in his capacity as an officer of Fiberex. As a result, we cannot attribute this travel to Atiq in his individual capacity, despite the fact C-Fabrics was not incorporated at the time of the trip.

Entering into a single contract with a Texas resident, generally, is insufficient to establish minimum contacts. *Michiana*, 168 S.W.3d at 786 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985)); *Max Protech, Inc. v. Herrin*, 340 S.W.3d 878, 886 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Because there is no allegation or evidence that the Agreement contemplated or resulted in ongoing activities directed at Texas by Atiq in his personal capacity, we cannot conclude that this single contact is sufficient to support a finding that Atiq purposefully availed himself of the benefits and laws of Texas. As a result, the trial court erred to the extent it concluded that specific jurisdiction exists with respect to CoTechno's claims of breach of contract, breach of fiduciary duty, and fraud.

**Tortious conduct**

Next, we consider CoTechno's assertion that because Atiq engaged in tortious conduct in Texas for which he is personally liable, he is subject to personal jurisdiction in Texas.

An officer's actions performed in his corporate capacity may subject him to personal jurisdiction and liability in his individual capacity if his actions were tortious or fraudulent. *Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 581 (Tex. App.—Austin 2006, no pet.). However, a corporate officer's tortious or fraudulent activities will support the exercise of specific jurisdiction only when (1) the corporate officer's contacts with the forum demonstrate purposeful availment and (2) the cause of action arises from or relates to these contacts. *See id.* (explaining that defendants' fraudulent and tortious actions could support exercise of specific jurisdiction only if actions constituted purposeful availment and were substantially connected to litigation and forum).

CoTechno's conversion claim against Atiq arises from two alleged activities: (1) that Atiq directed "Mark Williams to go to Texas and remove all the fiberglass from the CoTechno warehouse in Texas" and (2) that Atiq "directed his agent to represent to the court that the property was owned by Fiberex."[6] In considering whether these contacts demonstrate that Atiq purposefully availed himself of the privileges and benefits of conducting business in Texas, we are mindful of the Texas Supreme Court's decision in *Michiana*. 168 S.W.3d at 789. In that case, the court held that a nonresident defendant's ability to foresee that his actions would cause harm in the forum state "is not a 'sufficient benchmark' for exercising personal jurisdiction" and rejected those decisions from courts of appeals that had previously held that a nonresident could be subject to personal jurisdiction based on an allegation that the defendant "directed a tort" at Texas. *Id*. at 788-90. Atiq asserts that CoTechno's jurisdictional allegations of conversion are nothing more than allegations that Atiq in his personal capacity directed a tort at Texas and, under *Michiana*, are insufficient to support jurisdiction. *See id*. at 789; *see also Niehaus*, 208 S.W.3d at 583 (concluding that specific jurisdiction did not exist over corporate officer who allegedly engaged in fraudulent activity outside of Texas with effects felt in Texas). However, we need not decide whether these allegations demonstrate purposeful availment or are simply allegations that Atiq directed a tort. Instead, we conclude that Atiq's contacts, even if purposeful, are insufficient to support the exercise of specific

---

[6] While the parties ultimately dispute ownership rights in the fiberglass material, for purposes of analyzing jurisdiction we only consider whether this contact is sufficient to support the exercise of personal jurisdiction over Atiq. *See Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 660 (Tex. 2010) ("But the mere existence of a cause of action does not automatically satisfy jurisdictional due process concerns. . . . Instead, jurisdictional analysis always centers on the *defendant's* actions and choices to enter the forum state and conduct business."); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784-85 (Tex. 2005).

jurisdiction because the record does not support the conclusion that CoTechno's conversion claim is substantially connected to these contacts.

A cause of action relates to jurisdictional contacts when a substantial connection exists between the contacts and the operative facts of the litigation. *Moki Mac River Expeditions*, 221 S.W.3d at 576. Conversion is the "wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights," *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 211 n.44 (Tex. 2002), and the operative facts at trial concerning CoTechno's conversion claim against Atiq will be whether Atiq, or someone acting on his behalf, removed materials belonging to CoTechno from the CoTechno warehouse.

The conversion tort as alleged by CoTechno occurred in Texas and was felt in Texas, where the CoTechno warehouse was located. In addition, there can be no dispute that, based on CoTechno's allegations, Fiberex would be subject to the jurisdiction of Texas courts for CoTechno's conversion claim. However, there is no allegation or evidence suggesting that the materials were removed by Atiq personally or by persons acting on his behalf personally. Instead, the undisputed evidence demonstrates that any action taken by Williams or others in removing the materials from CoTechno's warehouse was conducted on behalf of Fiberex. According to Williams's deposition, which was submitted as evidence at the special-appearance hearing, Williams was employed by Fiberex at the time the materials were removed by Fiberex employees, and the materials were removed because, at least according to Williams, the materials were the property of Fiberex.

Because there is nothing in the record suggesting that Atiq personally participated in the alleged conversion, CoTechno's claim against Atiq is, in effect, a claim that Atiq participated

15

in a civil conspiracy to commit conversion. *See Chon Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005) (civil conspiracy occurs when there are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result"). However, personal jurisdiction over a nonresident defendant cannot be based solely upon the effects or consequences of an alleged civil conspiracy. *National Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995). Instead, jurisdiction must be based on whether the defendant himself purposefully established minimum contacts that satisfy due process. *Id*. CoTechno has alleged that a causal relationship exists between Atiq's communication to Williams and the removal of the materials; however, but-for causation alone is insufficient to support specific jurisdiction. *Moncrief Oil Int'l*, 414 S.W.3d at 142. The relationship between the alleged contact—Atiq's communications outside of Texas, requesting that others conduct activity in Texas—and the operative facts in the litigation of CoTechno's conversion claim is simply too attenuated to satisfy specific jurisdiction's due-process concerns with respect to Atiq personally.

Similarly, CoTechno alleges that Atiq interfered with its business relationships. Specifically, CoTechno alleges that "Mark Williams, on behalf of Fiberex and Atiq," made certain misrepresentations to CoTechno customers or potential customers that caused harm to CoTechno. However, CoTechno does not explain, and we cannot discern, the jurisdictional contacts with Texas, if any, to which this claim relates. There is no allegation that these representations were made in Texas or to Texas residents. Moreover, there is no evidence suggesting that these representations by Williams, if made, were made on behalf of Atiq personally and not on behalf of Fiberex. Accordingly, based on the pleadings and the record before us, we conclude that the trial court erred

16

to the extent it concluded that specific jurisdiction exists with respect to CoTechno's claim of tortious interference against Atiq.[7]

**Alter ego**

Finally, we consider CoTechno's assertion that Atiq is subject to personal jurisdiction based on the activities of C-Fabrics and Fiberex because the entities were operating as Atiq's alter ego.

Personal jurisdiction over an individual cannot be based on jurisdiction over a corporation with which the individual is associated unless the corporation is the alter ego of the individual. *Tabacinic*, 372 S.W.3d at 669; *D.H. Blair Inv. Banking Corp. v. Reardon*, 97 S.W.3d 269, 277 (Tex. App.—Houston [14th Dist.] 2002, pet. dism'd w.o.j.). While ordinarily a nonresident defendant has the burden to negate all bases for personal jurisdiction properly pleaded, a plaintiff who relies on the existence of an alter-ego relationship to impute a corporation's contacts with Texas to an individual must prove that such a relationship exists. *Washington DC Party Shuttle, LLC v.*

---

[7] CoTechno also argues that Atiq traveled to San Marcos in 2009, prior to the execution of the Agreement, to meet with CoTechno about the proposed contract and during that meeting fraudulently induced CoTechno to enter into the contract. Atiq asserts that CoTechno cannot rely on this fraud claim to support personal jurisdiction over Atiq because it was insufficiently pleaded. We agree.

The allegation that Atiq committed fraud in connection with his 2009 trip to San Marcos was not presented by CoTechno in its pleadings before the trial court. Rather, CoTechno's fraud claim, as presented in its pleadings, is that Atiq committed fraud when he signed the Future Business Agreement without any intent to perform. *Compare Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act."), *with Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001) ("Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations.").

17

*Iguide Tours, LLC*, 406 S.W.3d 723, 739 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).[8]

Evidence of alter ego includes proof of (1) the payment of alleged corporate debts with personal check or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate. *Crithfield v. Boothe*, 343 S.W.3d 274, 284-85 (Tex. App.—Dallas 2011, no pet.).

CoTechno claims that both C-Fabrics and Fiberex operated as the alter ego of Atiq. In relevant part, CoTechno has pleaded that:

> [C-Fabrics] was a shell: It had no operations; performed no tasks; had no employees; and, had no bank account. Atiq received checks payable to [C-Fabrics] and deposited those checks into either his personal account or the Fiberex account. [C-Fabrics] was supposed to be a wholly owned subsidiary of Fiberex, but [C-Fabrics] never issued any stock at all, much less to Fiberex. [C-Fabrics] had no employees and if any tasks needed to de done, it was either done by Atiq personally or a Fiberex employee at his direction. [C-Fabrics's] physical address was at the same location as a friend of Atiq's and if any mail came to that address, it was forwarded to Atiq, as a favor, by Atiq's friend. Finally, Fiberex issued invoices to [C-Fabrics's] customers on behalf of [C-Fabrics].

Most of CoTechno's alter-ego allegations are relevant to an issue not raised by CoTechno—whether C-Fabrics operated as the alter ego of Fiberex. *Cf. PHC-Minden, L.P. v.*

---

[8] Because due-process considerations cannot be overridden by statute or common law, veil-piercing for purposes of liability is distinct from veil-piercing for jurisdictional purposes. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 176 (Tex. 2007). As a consequence, courts have recognized that fraud, which is vital to piercing the corporate veil under section 21.223 of the Business Organizations Code, has no place in assessing contacts to determine jurisdiction. *Id*, Thus, to the extent CoTechno alternatively relies on its claims that Atiq used Fiberex as "a sham to perpetuate a fraud" as a separate basis for imputing jurisdictional contacts, we conclude that this reliance is improper.

18

*Kimberly-Clark Corp.*, 235 S.W.3d 163, 175-76 (Tex. 2007) (discussing whether parent company and subsidiary should be treated as one for purposes of jurisdiction). These allegations have no bearing on the jurisdictional issue at hand—whether C-Fabrics and Fiberex operated as the alter ego of Atiq. In fact, CoTechno's sole relevant jurisdictional allegation is its claim that Atiq deposited funds belonging to C-Fabrics and Fiberex in his personal account. However, CoTechno presented no evidence to support this allegation or any other finding that would suggest that Atiq commingled funds or otherwise failed to keep assets separate.[9] Because CoTechno failed to present sufficient evidence in support of its claim of alter ego, the trial court erred to the extent it imputed jurisdictional contacts to Atiq on this basis.

**General Jurisdiction**

Finally, based on the record before us and on those contacts that are properly attributable to Atiq in his personal capacity, we consider whether Atiq's contacts with Texas support the exercise of general jurisdiction. As previously discussed, "general jurisdiction involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *Id*. at 168. It requires a "more demanding minimum contacts analysis," *id*. (citing *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996)), and

---

[9] Moreover, to the extent CoTechno has sufficiently proven that C-Fabrics was operated as an alter ego of Atiq, it is unclear how this allegation, even if true, is relevant to Atiq's personal jurisdiction since CoTechno has not sued or otherwise alleged wrongdoing on the part of C-Fabrics. Other than entering into the Future Business Agreement, there are no alleged contacts with Texas on the part of C-Fabrics.

19

exists only when a nonresident's contacts with the state are continuous and systematic, *Moncrief Oil Int'l*, 414 S.W.3d at 150.

In this case, the undisputed evidence establishes that Atiq is domiciled in Canada, not Texas. *See Goodyear*, 131 S.Ct. at 2853-54 (explaining that "paradigm forum for the exercise of general jurisdiction is the individual's domicile"). Further, considering only those contacts that are attributable to Atiq in his personal capacity, which we previously discussed, CoTechno has failed to establish that Atiq, in his personal capacity, had any longstanding or substantial activities in Texas such that Atiq is "essentially at home in [Texas]." *Id*. at 2851. As a consequence, the trial court erred to the extent it concluded that general jurisdiction existed over Atiq.

## CONCLUSION

Because the trial court lacked personal jurisdiction, we reverse its order denying Atiq's special appearance and render judgment dismissing CoTechno's claims against him.

_____

Scott K. Field, Justice

Before Justices Puryear, Goodwin, and Field

Reversed and Rendered

Filed:   July 9, 2015

20

# Appendix 2

ACCEPTED
01-14-00800-cv
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/28/2015 3:19:13 PM
CHRISTOPHER PRINE
CLERK

**CASE NO 01-14-00800-CV**

IN THE FIRST COURT
OF APPEALS OF HOUSTON TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/28/2015 3:19:13 PM
CHRISTOPHER A. PRINE
Clerk

_____

PROPPANT SOLUTIONS, LLC,

Appellant

V.

EMMA DELGADO,

Appellee.

_____

**APPELLANT'S MOTION FOR EN BANC RECONSIDERATION**

_____

On Appeal From the 11th  Judicial District
Court of Harris County, Texas
Cause No. 2014-17992

_____

Syd Phillips (15955700)
Attorney at Law
1155 Dairy Ashford, Suite 104
Houston, Texas  77079
Tel: (281) 752-0300
Fax: (281) 759-3214
&
Bradley E. Featherston (24038892)
The Mendel Law Firm, LP
1155 Dairy Ashford, Suite 104
Houston, Texas  77079
Tel: (281) 759-3213
Fax: (281) 759-3214
ATTORNEYS FOR APPELLANT

1

Appellant, Proppant Solutions, asks the Court to grant this motion to reconsider the case en banc.

## A. <u>Introduction</u>

1.    Appellant is Proppant Solutions.  Appellee is Emma Delgado.

2.    A panel of the court issued the judgment and opinion in this case on July 14, 2015.  The majority opinion is attached as Exhibit "A."  The dissenting opinion is attached as Exhibit "B."

3.    The panel that rendered the judgment in this case consisted of Justices Keyes, Higley and Brown.

## B. <u>Argument & Authorities</u>

4.    The Court has the authority to grant this motion and submit the case to the full court, sitting en banc.  TEX. R. APP. P. 41.2, 49.7.

5.    The primary issue in the appeal was whether Defendant Emma Delgado, a Tennessee resident, is subject to personal jurisdiction in Texas.  The panel resolved the issue by holding that her conduct towards Texas was fortuitous with regard to establishing minimum contacts, with Justice Keyes dissenting.

6.    The panel's majority opinion greatly expands the Texas Supreme Court's opinion in *Michiana v. Holten*, 168 S.W.3d 777 (Tex. 2005), regarding what is "fortuitous" as opposed to "purposeful" contact with Texas.

**a. Delgado's conduct toward Texas was not fortuitous, it was purposeful.**

7.     The court ruled Delgado's conduct toward Texas was fortuitous, comparing it to *Michiana v. Holten*, 168 S.W. 3d 777 (Tex. 2005). With due respect to the Court, the majority decision misconstrues the holding in *Michiana*.

8.     In *Michiana*, an RV manufactured in Michigan was sold to a Texas resident. The defendant never did business in Texas. The RV's sale was unsolicited by the defendant and was delivered to the customer in Texas at the customer's request and expense. The Court found the defendant's contact with Texas was "fortuitous."

9.     The facts of this case are very different than *Michiana*. In 2010, Proppant Solutions, a California Corporation authorized to do business in Texas, obtained a contract to sell Chinese manufactured oil field proppant to EOG, a large oil company, also doing business in Texas. Joe Brown, Proppant's President, was new to the proppant business and wanted to partner with a more experienced company. He contacted ChristDel Corporation, a closely held Tennessee Corporation, of which Delgado was an owner, officer and director, after learning of its expertise in proppant and logistics, as advertised on its website. Proppant Solutions and ChristDel negotiated over a period of months, eventually agreeing to jointly sell and deliver oil field proppant to EOG in Texas.

10.     ChristDel and Proppant Solutions sold EOG millions of pounds of

3

proppant, which they imported from China and delivered to EOG through the Port of Houston to its facility in Pleasanton, Texas. For its share of the proppant sales to EOG, ChristDel was paid approximately $6,600,000 in profits and an additional $59,000,000 for logistical costs.

11.  Emma Delgado was personally involved in making representations to Proppant Solutions about it services, personally involved in the negotiation of the contract with Proppant Solutions, and was personally involved in the eighteen month performance of the EOG contract, including working directly with EOG.

12.  ChristDel's role was to move millions of pounds of proppant each month from China to the Port of Houston and then transport it by truck to EOG in Pleasanton, Texas. From the inception of negotiations with Proppant Solutions, Delgado certainly knew that the ultimate customer (EOG) was in Texas and that the focus of the project would primarily be in Texas. The Proppant Solutions/ChristDel's contract even stipulated that Texas law would apply to their relationship, with mandatory venue in Harris County, Texas.

13.  Despite the substantial amount of business conducted by ChristDel in Texas over 18 months, the majority opinion found that this case was similar to that of *Michiana*. However, this case was not the mere selling of a single product unsolicited to a Texas resident. Delgado and the other officers of ChristDel negotiated for months

4

to entice Proppant Solutions into a contract in which they partnered to do extensive business in Texas, earning millions of dollars over a period of 18 months.[1] <u>Their desire to participate in this project was purposeful.  It was not fortuitous or by chance.</u>

14.     The court's majority decision is contrary to the Texas Supreme Court's ruling that, "Sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities." *Michiana*, at 785, quoting *Travelers Health*, 339 U.S. at 647, 70 S.Ct. at 929.

15.     Proppant Solutions alleged that Delgado personally participated in ChristDel's fraudulent inducement of Proppant Solutions and in the breach of its fiduciary duty to Proppant Solutions.  Given her personal involvement in the procurement of the Proppant Solutions contract and the business conducted in Texas, it would not be unreasonable for Delgado to anticipate she might be "haled into court" in Texas for torts she committed during the project.

**b.  This case meets the criteria for fair play and substantial justice.**

16.     Because of it ruling on minimum contacts, the majority decision did not address the issue of fair play and substantial justice.  However, it is worth noting that

---

[1] Proppant Solutions claims that ChristDel make a secret profit on the logistics of the projects in excess of that which was paid to it for the profit on the proppant.

this case meets all of the criteria for fair play and substantial justice held in *Guardian Royal v. English China Clays*, 815 S.W.2d 223, 231 (Tex. 1991):

> The following factors, when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute (including the state's special regulatory interest in areas such as insurance); (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.

17. These issues were more than adequately addressed in Justice Keyes' Dissenting Opinion, pages 21through 24:

A. The financial burden of Delgado is minimal when compared to the profits earned by ChristDel, a closely corporation.

B. Texas has a vested interest in adjudicating the matter. The proppant Solutions/ChristDel contract stipulated Texas law would apply with venue in Harris County. One of the two owners of Proppant Solutions lives in Texas. One of the three owners of ChristDel live in Texas.

C. Marc Delgado, also a Tennessee resident and Director/Owner of ChristDel, has already filed an answer and submitted to jurisdiction in Texas.

D. Texas provides the most efficient resolution of the controversy in that many of the witness live in Texas. Without Emma Delgado as a party in Texas, Proppant Solution will have file suit against her in Tennessee. Thus, having the matter litigated in two separate states at the same time.

### C. **Prayer**

For these reasons, Appellant Proppant Solutions asks the Court to grant this motion to reconsider the case en banc.

Respectfully submitted,

//s// Syd Phillips

_____
Syd Phillips (15955700)
Attorney at Law
1155 Dairy Ashford, Suite 104
Houston, Texas  77079
Tel: (281) 752-0300
Fax: (281) 759-3214
sydphill@aol.com
&
Bradley E. Featherston (24038892)
The Mendel Law Firm, LP
1155 Dairy Ashford, Suite 104
Houston, Texas  77079
Tel: (281) 759-3213
Fax: (281) 759-3214
brad@mendellawfirm.com
ATTORNEYS FOR APPELLANT

**CERTIFICATE OF COMPLIANCE**

I hereby certify the number total number of words in this document is 1,476.

//s// Syd Phillips

_____
Syd Phillips

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2015, a true and correct copy of the above and foregoing instrument was served on all counsel of record as follows:

Thomas O. Deen (0713780)     Attorney for Defendant
Bland and Partners        Anthony Marcus Delgado
1717 St. James Place, Suite 360
Houston, Texas 77056
Tel: 713-828-1580; Fax: 877-965-8687

Nelson Skyler (00784982)      Attorney for Defendant
Brown Sims           Emma Delgado
1177 West Loop South, Tenth Floor
Houston, Texas 77027
Tel: 713-629-1580; Fax: 713-629-5027

Heather Ozuna (24071582)      Attorney for Defendant
James Lanter, PC         Juan Delgado
560 N. Walnut Creek, Suite 120
Mansfield, TX 76063
Tel: 817-453-4800; Fax: 817-453-4801

Philip R. Brinson (00787139)     Attorney for Defendant
LeClairRyan          ChristDel Corporation
1233 West Loop South, Suite 1000
Houston, TX 77027
Tel: 713-752-8351; Fax: 713-650-0027

Howard Jackson        Attorney for Defendant
Wimberly Lawson        Juan Delgado
550 Main Avenue, Suite 900
P.O. Box 2231
Knoxville, TN 37901-2231

           //s// Syd Phillips
           _____
           Syd Phillips

Exhibit "A"



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00800-CV

———————————

**PROPPANT SOLUTIONS, LLC, Appellant**

**V.**

**EMMA DELGADO, Appellee**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-17992**

---

## O P I N I O N

This is a personal jurisdiction case. Proppant Solutions, a California limited liability company, partnered with ChristDel, a Tennessee corporation, to provide oilfield proppant to EOG, a Texas oil company. After Proppant Solutions and ChristDel completed the contract, Proppant Solutions filed this lawsuit claiming

that ChristDel breached the partnership agreement, breached its fiduciary duty as a partner, and committed fraud. It also claimed that the three siblings who owned ChristDel, including Tennessee resident Emma Delgado, participated in ChristDel's breach of fiduciary duty, made fraudulent misrepresentations, and conspired to accomplish the fraud.

Emma filed a special appearance challenging the trial court's exercise of personal jurisdiction over her because she is a Tennessee resident, has no contacts with Texas outside of her business, and is not alleged in the petition to have committed a tort in Texas. Proppant Solutions responded that Texas has specific jurisdiction over Emma because of her involvement in the creation and performance of the contract between ChristDel and Proppant Solutions. The trial court granted Emma's special appearance, and Proppant Solutions timely appealed. We affirm.

## Background

This lawsuit arises from a contract between two businesses, Proppant Solutions and ChristDel. Proppant Solutions is a California limited liability company with its principal place of business in California. ChristDel is a Tennessee Corporation with its principal place of business in Tennessee.

Joseph Brown formed Proppant Solutions when, according to his affidavit, he "began looking into the business of selling oilfield proppant." Proppant

2

Solutions obtained a contract to provide oilfield proppant[1] to EOG facilities in Pleasanton, Texas. It planned to buy the proppant from China but needed a way to ship it to the United States. According to its petition, Proppant Solutions' majority owner, Brown, discovered ChristDel online. On its website, ChristDel represented that it "had extensive experience as a logistics supplier of proppant." Brown contacted ChristDel's corporate officers, including Emma; they told Brown that ChristDel "had extensive experience . . . moving large shipments of proppant from China to the U.S.A." They also represented that ChristDel "had fixed logistics contracts in place" for most of the shipping expenses and that with some variable expenses the total cost was "just over 15 cents per pound of proppant." Proppant Solutions offered—and ChristDel agreed—to fulfill the contract with EOG as a partnership, splitting the profits. As part of the partnership agreement, Proppant Solutions agreed to pay ChristDel the amount of the base costs, i.e., 15 cents per pound.

According to the petition, these representations were false. Proppant Solutions alleged that it would not have offered to complete the EOG contract with ChristDel as a partnership but for these representations. Brown relied on ChristDel

---

[1] According to the petition, "[p]roppant is a solid material, typically treated sand or man-made ceramic materials, designed to keep an induced hydraulic fracture open, during or following a fracture treatment."

because he "had no prior experience in buying, selling, or shipping proppant in the oilfield industry."

The petition alleged that ChristDel shipped millions of dollars of proppant from China to EOG in Texas over 18 months. ChristDel, acting through Emma, invoiced Proppant Solutions monthly. The invoices did not disclose ChristDel's costs, allegedly to "hide ChristDel's prior misrepresentations." Over the course of the contract, Proppant Solutions paid ChristDel over $50 million in expenses and $6 million in shared partnership profits. After the contract was completed, ChristDel refused to provide an accounting of its costs.

The petition identified four specific misrepresentations by Emma: (1) "Defendants had extensive experience in providing the logistics to move large shipments of proppant from China to Houston," (2) "Defendants had fixed logistics contracts in place and . . .the only variables were trucking fuel surcharges and demurrage," (3) "Defendants calculated their actual costs . . . [were] just over $0.15/pound of proppant," and (4) "the parties would share the profits 60/40." Proppant Solutions further alleged that Emma and the other individual defendants used ChristDel "for the purpose of perpetrating" a fraud.

All defendants appeared except Emma. Emma filed a special appearance stating that she is a Tennessee resident with no ties to Texas outside of her business, she is a director of ChristDel, she had no conversations with Proppant

4

Solutions regarding the matters in the lawsuit in her personal capacity, and all of her communications with Proppant Solutions occurred while she was in Tennessee. During her one trip to Texas in connection with the contract, she met with EOG, not Proppant Solutions.

In response to Emma's special appearance, Proppant Solutions filed an affidavit signed by its majority owner, Brown. In addition to supporting many of the factual allegations in the petition, Brown stated that after he discovered ChristDel's website he called and talked with Juan, Marcus, and Emma Delgado, who misrepresented ChristDel's experience. Contrary to these representations, ChristDel "had little or no experience in the logistics of moving proppant from China to the U.S.A." Therefore, ChristDel secretly hired a third party to perform many of its contractual obligations in return for a portion of its profits.

Brown claimed that he communicated with Emma "numerous times by email and telephone calls," although he never claimed that the communications between he and Emma were transmitted to or from Texas. With respect to the claim that ChristDel hid its costs, Brown averred that, because of her financial positon with ChristDel, Emma "had to be personally aware of . . . this fact."

Proppant Solutions filed a second affidavit by its co-owner, Michael Hall. Hall, who had primary responsibility for the company's financial matters, stated that he worked primarily out of his home in Texas and dealt directly with Emma

regarding "finance and billing." She communicated with Hall by email and telephone from her office in Tennessee. Emma sent him invoices for ChristDel's expenses. One expense item was a visit to Texas by Emma to meet with EOG officials and tour their Pleasanton facility. Finally, Hall stated that Emma also sent him documentation regarding the movement of proppant into the Port of Houston and then to Pleasanton.

Proppant Solutions filed a third affidavit signed by Ronald Cope, the principal shareholder of the Houston-based company that assisted ChristDel with shipping the proppant. Cope averred that he had estimated ChristDel's shipping cost at only 10 cents per pound, but ChristDel marked up the cost to over 15 cents per pound to increase its profits.

The trial court granted Emma's special appearance without issuing any findings of fact or conclusions of law. Proppant Solutions timely appealed.

**Standard of Review**

"Whether a court has personal jurisdiction over a nonresident defendant is a question of law, which we review de novo." *Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). When, as here, the trial court did not make findings of fact or conclusions of law, we infer all findings necessary to support the trial court's ruling. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d

6

569, 574 (Tex. 2007); *Stull v. LaPlant*, 411 S.W.3d 129, 133 (Tex. App.—Dallas 2013, no pet.).

## Jurisdictional Pleading Requirements

In a special appearance, the parties bear shifting burdens. "[T]he plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). A plaintiff may carry its initial pleading burden in its petition or response to the defendant's special appearance. *Stull*, 411 S.W.3d at 134; *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.). If, however, "the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly*, 301 S.W.3d at 658–59.

"Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* at 658. "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.* The defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659. A

7

defendant negates jurisdiction on a factual basis by presenting evidence showing an absence of contacts with Texas, thus disproving the plaintiff's jurisdictional allegations. *Stull*, 411 S.W.3d at 134 (citing *Kelly*, 301 S.W.3d at 659). A defendant negates the legal basis for jurisdiction by showing that "if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts . . . fall short of purposeful availment; . . . the claims do not arise from the contacts; or . . . traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Kelly*, 301 S.W.3d at 659.

If the nonresident defendant produces evidence negating personal jurisdiction, the burden returns to the plaintiff to show that the court has personal jurisdiction over the nonresident defendant. *Stull*, 411 S.W.3d at 134. A court should dismiss a lawsuit against a nonresident defendant if the exercise of personal jurisdiction lacks an adequate factual or legal basis. *Id.*

### Requirements for Personal Jurisdiction

"Texas courts have personal jurisdiction over a nonresident defendant when (1) the Texas long-arm statute provides for it, and (2) the exercise of jurisdiction is consistent with federal and state due process guarantees." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

The Texas long-arm statute authorizes Texas courts to exercise personal jurisdiction over anyone "doing business" in Texas. TEX. CIV. PRAC. & REM. CODE

ANN. § 17.042 (West 2015). "The broad language of the long-arm statute's 'doing business' requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). Consequently, the statute's requirements are satisfied if exercising jurisdiction comports with federal due process limitations. *Spir Star*, 310 S.W.3d at 872.

Due process is satisfied "when two conditions are met: (1) the defendant has established 'minimum contacts' with the forum state, and (2) the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 210 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Depending upon the nature of a nonresident's contacts, personal jurisdiction may be general or specific. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013).

### Specific Jurisdiction

Proppant Solutions asserts that Delgado is subject to specific personal jurisdiction. "Specific jurisdiction . . . arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Retamco Operating Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009); *see also Moki Mac*, 221

9

S.W.3d at 576, 579 (specific jurisdiction requires satisfaction of "two co-equal components").

## A. Purposeful availment

The first prong of specific jurisdiction, purposeful availment, is the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). To determine whether a defendant has purposefully availed herself to the benefits of Texas law, we consider (1) the defendant's own actions but not the unilateral activity of another party, (2) whether the defendant's actions were purposeful rather than "random, isolated, or fortuitous," and (3) whether the defendant sought "some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* at 785. "The purposeful availment test should focus on 'the defendant's efforts to avail itself of the forum' and not 'the form of action chosen by the plaintiff.'" *Touradji*, 316 S.W.3d at 24 (quoting *Moki Mac*, 221 S.W.3d at 576); *see Michiana*, 168 S.W.3d at 789–90 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183 (1985)) (for determining personal jurisdiction, "it is 'the defendant's conduct and connection with the forum' that are critical").

## B. Relatedness

The second prong, relatedness, analyzes the relationship between the defendant, the forum, and the litigation. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592,

596 (Tex. 2007); *Moki Mac*, 221 S.W.3d at 576. Generally, courts analyze the relationship between jurisdictional contacts and each claim separately. *Moncrief*, 414 S.W.3d at 150. However, "a court need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts." *Id.* at 150–51.

**Pleadings and Evidence Before the Trial Court**

Proppant Solutions asserts that Emma has sufficient minimum contacts with Texas because she: (1) "participated in negotiating the relationship between ChristDel and Proppant Solutions as they prepared to do business in Texas," (2) "personally participated in organizing the delivery and receipt [of the oilfield proppant] from China through the Port of Houston, and onto Pleasanton, Texas," (3) "sent and received e-mails to and from Texas billing for the logistic services and the expenses [of transporting the proppant]," and (4) "traveled to Texas to personally review the logistics operation."

A. **Emma's role in forming the relationship between ChristDel and Proppant Solutions is not personal availment**

Emma's role in the formation of the relationship between ChristDel and Proppant Solutions—her response to Proppant Solutions' inquiry allegedly misrepresenting ChristDel's capabilities and experience—was not a purposeful contact with Texas for three reasons. First, the choice of Texas as the delivery point was, for Emma, entirely fortuitous. Second, nonresident agents of

11

nonresident businesses negotiated the contract outside of Texas. Third, Proppant Solutions never alleged that Emma actually participated in those negotiations.

### 1. Proppant Solutions' prior relationship with EOG is fortuitous

The mere fact that Emma's response to Proppant Solutions' inquiry led to a business agreement to fulfill Proppant Solutions' preexisting contract with EOG in Texas is not, by itself, enough to show purposeful availment. "Sellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter . . . . By contrast, a defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous.'" *Michiana*, 168 S.W.3d at 785.

In *Michiana*, a Texas plaintiff, Holten, contacted Michiana, a factory outlet for Coachmen RVs. Based on his conversations with the company, Holten purchased an RV. At Holten's request and expense, Michiana shipped the RV to Texas. *Id.* at 784. Holten subsequently sued Michiana in Texas for fraudulent misrepresentations made during Holten's telephone conversation with Michiana, for breach of contract, and for statutory claims. *Id.* at 781, 788–92.

The Court concluded that Michiana had no purposeful contacts with Texas. Michiana never solicited Holten's business. It never marketed itself in Texas nor made any attempt to enter the Texas RV market. Michiana's contact with Texas arose solely because a Texas resident decided to buy an RV from it. Had Holten

not been a Texan, Michiana would have had no contact with Texas. *Id.* at 785–87. This contact with Texas was fortuitous because it arose from Holten's actions, not Michiana's. *See id* at 786.

"[T]he mere sale of a product to a Texas resident will not generally suffice to confer specific jurisdiction upon our courts. Instead, the facts alleged must indicate that the seller intended to serve the Texas market." *Moki Mac*, 221 S.W.3d at 577. In *Moki Mac*, Texas plaintiffs sued Moki Mac, a Utah river-rafting expedition company, in Texas for the wrongful death of their son during a rafting expedition in Arizona. The Court noted, "Unlike in *Michiana*, the evidence . . . indicates that Moki Mac does intend to serve the Texas market." *Id.* Moki Mac regularly sold rafting trips to Texas residents. It sent targeted mailings to Texas residents, advertised in Texas newspapers and national publications with Texas subscribers, ran mass and targeted direct-marketing e-mail campaigns to solicit Texas clients, worked with Texas residents to solicit Texas business, and offered Texas residents various incentives to sign up for an expedition. *Id.* at 577–78. "Moki Mac's contacts with Texas did not result, as did the defendant's in *Michiana,* from the mere fortuity that the [plaintiffs] happened to reside here. Rather, the contacts it had with Texas resulted from additional conduct through which it aimed to get extensive business in or from this state." *Id.* at 578.

In a commercial dispute, the unilateral activities of others will not support specific jurisdiction over a defendant. *Parex Res., Inc. v. ERG Res., LLC*, 427 S.W.3d 407, 422 (Tex. App.—Houston [14th Dist.] 2014, pet. filed). In *Parex*, a Texas company, ERG, sought to buy shares of a Columbian oil and gas interest from Nabors, a Bermudan company with a Houston office. *Id.* at 412. During these negotiations, Nabors solicited other bidders from the Royal Bank of Canada, which in turn solicited a bid from Parex Canada, a Canadian company. *Id.* at 413. Parex began communicating with Nabor's Houston office about the shares. *Id.* at 414. Shortly thereafter, ERG and Nabors entered into a contract to sell the shares; when that deal failed to close, Parex re-submitted its bid. *Id.*

ERG sued Nabors and Parex for specific performance of its contract and for tortious interference of contract. But the Fourteenth Court of Appeals found that Texas did not have special jurisdiction over Parex. "Parex Canada's initial contact with Nabors . . . was solicited by Nabors and did not stem from Parex Canada's unsolicited decision to reach into Texas. Accordingly, Parex Canada's decision to engage in negotiations with a Texas company . . . was fortuitous and based on Nabors's unilateral activities." *Id.* at 421. The court noted that even after Parex began actively competing with ERG, "Parex Canada's decision to reach into Texas via these contacts was certainly less purposeful than if Parex Canada was independently seeking out a Texas seller without initial prompting from Nabors."

*Id.* at 422. *"Moreover, the fact that Texas-based ERG was now part of the equation was based on Nabors's unilateral decision to contract with ERG, not any Parex Canada decision." Id.* Accordingly, Parex's offer did "not support substantial Texas availment." *Id.*

This case is more like *Michiana* and *Parex* than *Moki Mac*. Here, there is no evidence that ChristDel or Emma have ever attempted to market themselves to Texas or serve the Texas market. Emma, in particular, had no self-initiated contacts with Texas. Her only contacts with Texas were, much like in *Michiana* and *Parex*, because a customer with ties to Texas contacted her Tennessee employer. Importantly, Proppant Solutions actively recruited ChristDel and its personnel, not vice versa. Proppant Solutions agreed to provide oilfield proppant to EOG in Texas. Proppant Solutions then sought out ChristDel to help perform this task. Proppant Solutions offered to fulfill the contract[2] with ChristDel and split the profits.

The dissent contends that, by relying on *Michiana* and *Moki Mac*, we "fail to recognize the distinction between establishing personal jurisdiction over a defendant in a stream of commerce case and establishing personal jurisdiction over a defendant in a fraud and fraudulent inducement case brought with respect to the negotiation and performance of a contract." But *Michiana* was a fraud case.

---

[2] The contract contains a Texas choice-of-law provision and a Houston forum-selection clause—but Emma was not a party to the contract.

15

*Michiana*, 168 S.W.3d at 788, 791. Personal jurisdiction is established by contacts, not culpability. *Id.* As *Parex* indicates, the underlying reasoning of *Michiana* and *Moki Mac*—that a defendant must purposefully reach out to Texas—is not limited to the typical stream of commerce context. Moreover, "jurisdictional analysis always centers on the *defendant's* actions and choices to enter the forum state and conduct business." *Kelly*, 301 S.W.3d at 660. It was Proppant Solutions, not Emma, who chose for the product to be delivered in Texas.

### 2.    Nonresidents negotiated the contract outside of Texas

The contract was negotiated outside of Texas by nonresidents on behalf of two nonresident businesses. And Emma is not a party to the contract. Thus any connection to Texas from these negotiations or from the written contract alone would be "even less purposeful and more attenuated." *See Peredo v. M. Holland Co.*, 310 S.W.3d 468, 475 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (third party's Texas contacts, which resulted from a contract between two nonresidents, did not satisfy minimum-contacts requirement).

### 3.    Emma's involvement in the formation of the contract was limited

The alleged scope of Emma's involvement in the formation of the business relationship is small, and the extent of Emma's knowledge regarding Proppant Solutions' relationship to Texas when she spoke to Brown is unclear. The petition simply says: "ChristDel's owners, Juan, Marc, and Emma Delgado each later

verified [statements on ChristDel's website] that . . . ChristDel had extensive experience in providing logistics and moving large shipments of proppant." According to Brown's affidavit, this representation was made *before* Proppant Solutions proposed to fulfill the EOG contract as a partnership. There is no allegation and no evidence regarding whether Emma participated in negotiating the partnership agreement between Proppant Solutions and ChristDel or whether she knew of Proppant Solutions' connection to EOG in Texas when she spoke to Brown.

Thus, Emma did not purposefully direct her activities toward Texas by responding to Brown's inquiries regarding ChristDel's experience shipping proppant. Rather, Proppant Solutions unilaterally responded to representations by Emma and other ChristDel associates by seeking ChristDel's assistance to fulfill Proppant Solutions' preexisting obligations to EOG. From Emma's perspective, that Proppant Solutions had previously contracted with an EOG facility in Texas, instead of any other state, was merely fortuitous.

**B.     That Emma communicated with an off-site employee working from a home office in Houston, instead of Proppant Solutions' California headquarters, was merely fortuitous**

For similar reasons, Emma's communications with Michael Hall in Houston also do not constitute a purposeful contact with Texas.

17

According to his affidavit, Hall "was responsible for handling the financial aspects of the partnership agreement between Proppant Solutions and ChristDel." Emma "handled finance and billing for ChristDel." "Each month . . . I received an invoice for the logistics of shipping the proppant from Emma. She also periodically sent me invoices for ChristDel's expenses . . . ."

It was Emma's responsibility to send these communications to her counterpart at Proppant Solutions—Michael Hall. These were business communications between a two businesses registered and headquartered outside of Texas. The record does not contain any evidence that Emma actively sought to work with an off-site employee in Texas instead of Proppant Solutions' California headquarters or that she sought any benefit of Texas law thereby. The record indicates that Hall worked from a home office in Houston. If Proppant Solutions had a functioning satellite office, the record reveals nothing about it. It does not reveal whether any other Proppant Solutions employees work in Texas or anywhere else outside of California. And it does not explain why Hall, a senior officer and co-owner of Proppant Solutions, worked at home in Houston.

Thus, the record suggests no reason why these calls and e-mails were sent to Houston other than Hall's decision to receive them there. But Hall's unilateral decision does not determine personal jurisdiction over Emma. *See Michiana*, 168 S.W.3d at 794 (RV dealership not subject to special jurisdiction in Texas because

18

its "only contact with Texas was Holten's decision to place his order from there"). That Hall worked from his home office in Houston, not California, was merely fortuitous. *See Parex*, 427 S.W.3d at 427 ("Parex Canada's telephone, email, and virtual data room contacts with Nabors coupled with a finding that Parex Canada intended the contacts to harm ERG in Texas is not enough to establish purposeful availment.").

## C. The record does not establish Emma's participation in organizing the proppant delivery

Proppant Solutions also contends that specific jurisdiction is proper because Emma "personally participated in organizing the delivery and receipt [of the oilfield proppant] from China through the Port of Houston, and onto Pleasanton, Texas." The dissent agrees, contending that "[Emma] helped organize the receipt of the proppant in Houston, and she arranged for trucks to deliver it to Pleasanton. She . . . arrang[ed] the logistics of the transportation and [dealt] with financing and billing."

But Proppant Solutions' petition alleged a much more limited role: "ChristDel, through its financial officer, Emma Delgado, sent eighteen monthly invoices to Michael Hall, Proppant Solutions' financial officer in Houston, Texas." Proppant Solutions' response to the special appearance explained: "She was the administrator of ChristDel and handled its finances and invoiced Proppant Solutions monthly for expenses and logistics . . . . She was responsible for the

19

billing to Proppant Solutions for all expenses and charges for logistics for the entire project . . . ."

The only allegation to the trial court suggesting that Emma controlled or orchestrated proppant delivery comes from Proppant Solutions' sur-reply, which alleged: "Emma was involved in setting up a logistics chain in Texas to import [proppant] for ultimate destination in Pleasanton, Texas." That allegation cites an e-mail from Emma to Proppant Solutions, which states, "Juan, Marc and I have delivered a logistics chain that is competitive." Assuming that we may consider an allegation raised for the first time in a sur-reply, this sheds almost no light on Emma's role, if any, in coordinating the movement of proppant. Absent more, this is not enough to establish purposeful availment.

## D.     Emma's visit to Texas is not related to this litigation

Proppant Solutions relies on Emma's visit to EOG's Pleasanton, Texas facility to support the exercise of specific jurisdiction. But Proppant Solutions did not allege that Emma ever met with, communicated with, or committed any tort against Proppant Solutions while visiting Texas.

This contact cannot support special jurisdiction over Emma because no alleged liability arises from or is related to it. *See Kelly*, 301 S.W.3d at 659–60. In *Kelly*, an Arizona general contractor contracted to renovate a Houston hotel. *Id.* at 655. The general contractor hired several Texas subcontractors to perform the

20

work. *Id.* After the contract was performed, the hotel owner asserted that the work was substandard and sued the general contractor and the subcontractors. *Id.* at 655–56. One of the Texas subcontractors filed third-party claims for breach of contract, violation of the Texas Trust Fund Act, and fraud against the Arizona general contractor and its corporate officers. *Id.* at 656.

The third-party plaintiff asserted that the officers of the general contractor, despite operating from the Arizona office, had the following Texas contacts: they received the subcontractors' invoices from Texas, sent payments and change orders from Arizona to the subcontractors in Texas, and traveled to Texas several times during the renovation to oversee the subcontractors' work. *Id.* The Texas Supreme Court held that these activities did not allow Texas to exercise specific jurisdiction over the officers; the subcontractor's pleading "contain[ed] no allegations that the [o]fficers' wrongdoing occurred in Texas. . . . [I]t did not allege that any fraudulent acts occurred in Texas." *Id.* at 659–60. "Thus, although [the subcontractor] has alleged two claims of wrongdoing, it has not alleged that any acts giving rise to these two claims occurred in Texas." *Id.* at 660.

Nevertheless, Proppant Solutions cites *Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658, at *1 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.), to assert that Emma's one visit to Texas is enough to create specific jurisdiction. In *Carlile*, a Colorado corporation sought

out a business relationship with a Texas corporation; two officers from the Colorado corporation allegedly made fraudulent statements while meeting with the Texas corporation in Texas. *Id.* "These allegations met [the plaintiffs'] initial pleading burden by alleging acts or omissions in Texas . . . and torts arising from such conduct." *Id.* at \*12.

This case is more similar to *Kelly* than *Carlile*. Here, Proppant Solutions never alleged any tort arising from Emma's visit to EOG in Texas. It has not alleged any interaction with Emma during her trip. It has not asserted a claim based on any alleged misrepresentation made during or about the trip. Therefore, Emma's visit to the EOG facility is not substantially related to Proppant Solutions' claims against her.

## E. Proppant Solutions cannot rely on directed-at tort jurisdiction

The allegation that all of Emma's actions were part of a conspiracy intended to defraud Proppant Solutions in Texas does not aid its case. Only Emma's contacts, not the contacts of her co-defendants, affect our analysis. *See Burger King*, 471 U.S. at 474–75, 105 S. Ct. at 2183 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40 (1958)); *see also Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (criticizing conspiracy as independent basis for jurisdiction). Further, the Texas Supreme Court has rejected directed-at tort jurisdiction. *Michiana*, 168 S.W.3d at 790; *see also Curocom Energy LLC v.*

*Young-Sub Shim*, 416 S.W.3d 893, 897 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Directing a tort at the forum from afar does not constitute purposeful availment."); *Proskauer Rose LLP v. Pelican Trading, Inc.*, No. 14–08–00283–CV, 2009 WL 242993, at *4 (Tex. App.—Houston [14th Dist.] Feb. 3, 2009, no pet.) (mem. op.) (rejecting "directed-at-tort contentions" and holding trial court did not have specific personal jurisdiction over New York law firm whose attorney created opinion letter in New York and sent it to Texas). Rather, "jurisdiction turns . . . on a defendant's contacts, [not] where the defendant 'directed a tort.'" *Michiana*, 168 S.W.3d at 790. Thus the issue is not whether there was a tortious conspiracy directed at Texas, but rather whether Emma has sufficient minimum contacts with Texas to support the exercise of specific personal jurisdiction over her. For the reasons stated in this opinion, we conclude that she does not.

## Conclusion

Under the applicable standards of review and based on Proppant Solutions' allegations and evidence, we find no substantial connection between Emma's purposeful contacts with Texas and the operative facts of this litigation. *See Moki Mac*, 221 S.W.3d at 585–88 (finding no specific jurisdiction because substantial connection between defendant's purposeful contacts with Texas and operative facts of litigation did not exist); *BMC Software*, 83 S.W.3d at 797 (concluding no specific jurisdiction existed for contact that occurred outside of Texas).

23

Accordingly, we overrule Proppant Solutions' sole issue on appeal and affirm the trial court's order granting Emma's special appearance.

                                    Harvey Brown
                                    Justice

Panel consists of Justices Keyes, Higley, and Brown.

**Opinion issued July 14, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00800-CV

———————————

**PROPPANT SOLUTIONS, LLC, Appellant**

**V.**

**EMMA DELGADO, Appellee**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-17992**

---

### DISSENTING OPINION

The majority affirms the dismissal of defendant Emma Delgado from this litigation for lack of personal jurisdiction. I respectfully dissent. In my view, the majority opinion misconstrues the relevant facts and law in dismissing from the litigation a defendant who plainly has minimum contacts with Texas; and in doing

so, it denies constitutional fair play and substantial justice to the other defendants in this case and to Proppant Solutions.

Plaintiff Proppant Solutions, LLC, has alleged that Delgado, an owner, secretary, and Director for Administration/Finance of Defendant ChristDel Corporation, established minimum contacts with Texas that submitted her to its long-arm jurisdiction by her participation in the fraudulent inducement and fraudulent performance of the underlying agreement between ChristDel and Proppant Solutions. Under the agreement, ChristDel agreed to provide logistics for the receipt in China of Chinese-manufactured ceramic proppant used in oil field fracking, its delivery to the Port of Houston, its storage in Houston, its transportation across Texas, and its delivery to Proppant Solutions' customer, EOG Resources, Inc., in Pleasanton, Texas.

I agree with Proppant Solutions that Delgado is subject to personal jurisdiction in Texas—to which all other parties have submitted, including ChristDel—and I would so hold.

## Background Facts

It is undisputed that Delgado, a resident of Tennessee, was an owner, the Secretary, and the Director of Administration/Finance of defendant ChristDel Corporation, a Tennessee corporation, at the time the parties entered into and performed the underlying "Service Contract" (the "ChristDel/Proppant Solutions

Contract") between ChristDel and Proppant Solutions, a California limited liability company. Proppant Solutions' allegations of fraudulent inducement and fraud against Delgado arise from her participation in the negotiation and performance of the ChristDel/Proppant Solutions Contract.

The ChristDel/Proppant Solutions Contract itself was the result of an agreement between Proppant Solutions and its customer, EOG Resources, Inc., a Texas corporation, obligating Proppant Solutions to ship proppant from China to Pleasanton, Texas, for delivery to EOG (the "Proppant Solutions/EOG Agreement"). Proppant Solutions entered into the ChristDel/Proppant Solutions Contract to enable it to perform its obligations under the Proppant Solutions/EOG Agreement. Also pursuant to the Proppant Solutions/EOG Agreement, Proppant Solutions entered into a contract with a Chinese company, Pacific Ark, Inc. ("PacArk"), to purchase proppant manufactured in the People's Republic of China to be delivered to Qingdau, China for export to Texas in thirteen monthly shipments (the "Ceramic Proppant Contract").

The ChristDel/Proppant Solutions Contract contained a merger clause, which provided that "[t]his contract, including referenced exhibits, represents all of the terms and conditions agreed upon by the parties and represents the entire agreement between the parties." The referenced exhibits included the Proppant Solutions/EOG Agreement (Exhibit A) and the Ceramic Proppant Contract

3

(Exhibit B). The "entire agreement" thus included all three contracts. Proppant Solutions filed a copy of the ChristDel/Proppant Solutions Contract referencing its exhibits as an exhibit in this special appearance proceeding.

Pursuant to the ChristDel/Proppant Solutions Contract, ChristDel agreed to accept delivery from PacArk of each monthly shipment of proppant in Qingdau, or another agreed-upon Chinese port of departure, for shipping to the Port of Houston and on to the end destination, Pleasanton, Texas, for delivery to a warehouse to be designated by EOG and provided by Proppant Solutions to ChristDel in advance of each monthly shipment. ChristDel agreed to arrange transportation of the proppant from the port of departure in China to Pleasanton on a schedule consistent with both the Proppant Solutions/EOG Agreement and the Ceramic Proppant Contract; to provide adequate vessel space to carry the proppant; to provide a commercial invoice and packing list for each monthly shipment; to serve as the importer of record; to manage customs clearance and inspections; to receive each monthly shipment at the Port Terminal in Houston, Texas; and to cause the proppant to be transported suitably to Pleasanton. ChristDel also agreed to warehouse the proppant in its Houston facility until the proppant was delivered to Pleasanton in the event that EOG was unable or unwilling to accept the proppant within thirty days of its arrival in Houston.

4

ChristDel further committed to regularly exchange information with regard to shipping schedules, the status of the monthly shipments once they left China, and the anticipated delivery date in order "to comply with the requirements of the [Proppant Solutions/EOG] Agreement and [the Ceramic] Proppant Contract and not incur any unnecessary delays or expense"; "to issue a bill of lading for each monthly shipment and to fax or email it directly to EOG as required by the [Proppant Solutions/EOG] Agreement and copied to [Proppant Solutions]"; to direct the transportation of each monthly shipment of proppant; to make all logistical decisions applicable to each monthly shipment "in order to meet the requirements of [the ChristDel/Proppant Solutions] Contract, the [Proppant Solutions/EOG] Agreement, and the [Ceramic] Proppant Contract"; and to provide the necessary staff, employees, and contractors to fulfill the requirements of the ChristDel/Proppant Solutions Contract.

Proppant Solutions, in return, agreed to pay ChristDel a fixed rate of $1.51 for each pound of proppant shipped under the contract (the "base charge"); and ChristDel agreed to be responsible for paying all normal and customary charges associated with shipping, importing, and transporting the monthly shipments of proppant. Proppant Solutions also agreed to be responsible for certain other charges as specified in the ChristDel/Proppant Solutions Contract.

According to the pleadings and exhibits in this special appearance proceeding, many tons of proppant were received by ChristDel at the Port of Houston in monthly shipments delivered over a period of eighteen months pursuant to the ChristDel/Proppant Solutions Contract, at a total cost of $59 million. The proppant was stored by ChristDel in its warehouse in Houston as necessary to fulfill the Proppant Solutions/EOG Agreement. The proppant was moved through Texas under arrangements made by Delgado and others at ChristDel. And ChristDel arranged its delivery to EOG in Pleasanton, Texas.

From ChristDel's headquarters in Tennessee, Delgado helped organize the receipt of the proppant in Houston and arranged for trucks to deliver it to Pleasanton. She personally visited Texas to review the operations with Proppant Solutions and EOG. She also exchanged numerous emails and telephone calls with Proppant Solutions' 40%-owner and representative in Houston, Michael Hall—who was also Proppant Solutions' chief financial officer, just as Delgado was ChristDel's Director for Administration and Finance—and others in Texas to arrange the logistics and finances for the storage and transportation of the proppant. Delgado also sent the allegedly fraudulent invoices to Hall in Texas, and these invoices are the primary basis for Proppant Solutions' fraud claims.

As support for its pleadings in this special appearance proceeding filed by Delgado, Proppant Solutions filed an affidavit by Hall, who had primary

6

responsibility for the company's financial matters. In his affidavit, Hall averred that he worked primarily out of his home in Texas and dealt directly with Delgado regarding "finance and billing" by email and telephone from her office in Tennessee to his home in Texas, where she also sent him invoices for ChristDel's expenses. One of these expense items invoiced Proppant Solutions for a visit to Texas made by Delgado to meet with EOG officials and tour their Pleasanton, Texas facility. Hall further stated that Delgado sent him documentation regarding the movement of proppant into the Port of Houston and on to Pleasanton.

Proppant Solutions also filed an affidavit signed by Ronald Cope, the principal shareholder of the Houston-based company that assisted ChristDel with shipping the proppant. Cope averred that he had estimated ChristDel's shipping cost at only ten cents per pound, but ChristDel marked up the cost to over fifteen cents per pound to increase its profits. In short, Cope provided a material part of the factual basis for concluding that the invoices sent by Delgado to Hall in Texas contained fraudulent misrepresentations of the shipping costs and that the performance of the contract was the execution of a scheme to defraud Proppant Solutions to the personal enrichment of ChristDel and its owners and officers, including Delgado.

Delgado, however, contends, and the majority agrees, that under the law and the facts of this case, she lacks the minimum contacts with Texas necessary to

7

subject her to personal jurisdiction in Texas under the Texas long-arm statute on the claims of fraudulent inducement and fraud brought against her by Proppant Solutions for her actions in negotiating and performing the ChristDel/Proppant Solutions Contract. I disagree. I would hold that the Texas courts have jurisdiction over Delgado for purposes of this litigation, and I would therefore reverse the order of dismissal and remand the case for trial on the merits against all defendants, including Delgado.

## Law of Personal Jurisdiction

### A. *The Scope of the Texas Long-Arm Statute and the Requirements of Federal and State Due Process*

"Texas courts have personal jurisdiction over a nonresident defendant when (1) the Texas long-arm statute provides for it, and (2) the exercise of jurisdiction is consistent with federal and state due process guarantees." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

In relevant part, the Texas long-arm statute provides that a nonresident defendant submits himself to the jurisdiction of this state by doing business in this state if the nonresident, inter alia, "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" or "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 2015).

8

In turn, federal due process requires two things. "First, the nonresident defendant must have purposefully established such minimum contacts with the forum state that the defendant could reasonably anticipate being sued there." *Glattly v. CMS Viron Corp.*, 177 S.W.3d 438, 446 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S. Ct. 2174, 2183–84 (1985)). "Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice." *Id.* at 447 (citing *Burger King*, 471 U.S. at 475–76, 105 S. Ct. at 2183–84).

### 1. *The first prong of due process: minimum contacts*

The first prong of due process, the minimum contacts element, is divided into specific and general jurisdiction. *Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 (Tex. 1991). Proppant Solutions asserts that Delgado is subject to specific personal jurisdiction.

"Specific jurisdiction . . . arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Retamco Operating Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576, 579 (Tex. 2007) (stating that specific jurisdiction requires satisfaction of "two co-equal components": privilege of

conducting activities in Texas and substantial connection between contacts and operative facts of litigation); *see Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (stating that for jurisdictional due process, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws") (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)).

In establishing purposeful availment, only the defendant's contacts with the forum state count; "the acts relied on must be 'purposeful' rather than fortuitous," and the "defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Michiana*, 168 S.W.3d at 785. "Sellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." *Id.* (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647, 70 S. Ct. 927, 929 (1950)).

To impose personal jurisdiction, it is not necessary that the defendant's conduct actually have occurred in Texas so long as her acts were purposefully directed towards the state. *See Calder v. Jones*, 465 U.S. 783, 789–90, 104 S. Ct. 1482, 1487 (1984); *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996); *SITQ E.U., Inc. v. REATA Rests., Inc.* 111 S.W.3d 638, 646 (Tex. App.—Fort Worth

10

2003, pet. denied). Indeed, "a defendant should reasonably anticipate being hauled into court where the effects of [her] conduct have been intentionally caused through that purposeful direction of activity toward the forum state, even if the defendant never physically enters the state." *SITQ E.U.*, 111 S.W.3d at 646. The courts consider the quality and nature of the defendant's contacts, not their number or the ubiquity of their means. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). "[T]he question . . . is not whether certain of [the defendant's] contacts with Texas, standing alone, are sufficient to subject [her] to personal jurisdiction here. Instead, it is whether there is a substantial connection between all of [her] Texas contacts, considered collectively, and the operative facts of the litigation." *Dodd v. Savino*, 426 S.W.3d 275, 286 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

   2.   *The second prong of due process: fair play and substantial justice*

To satisfy the second prong of federal due process, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *See Guardian Royal Exch.*, 815 S.W.2d at 226. In making this determination, a court must consider five factors: (1) the burden on the defendants; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and

11

(5) the shared interest of the several states in furthering fundamental, substantive social policies. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113–16, 107 S. Ct. 1026, 1033–34 (1987); *Burger King*, 471 U.S. at 477, 105 S. Ct. at 2185; *Guardian Royal Exch.*, 815 S.W.2d at 226. The defendant bears the burden of presenting a "compelling case" that exercising jurisdiction over her would not be fair and just. *See Spir Star AG*, 310 S.W.3d at 878 (quoting *Guardian Royal Exch.*, 815 S.W.2d at 231). Only rarely will the Texas courts' exercise of personal jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal Exch.*, 815 S.W.2d at 231.

### 3. Burden of proof of personal jurisdiction

To establish personal jurisdiction, a plaintiff initially need only plead allegations sufficient to bring a nonresident defendant within the terms of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). In a tort case, such as one alleging fraudulent inducement and fraud, the plaintiff must plead that the defendant committed a tortious act, in whole or in part, in Texas. *Id.* at 659. The plaintiff's original pleadings, as well as its response to the defendant's special appearance, can be considered in determining whether the plaintiff satisfied its burden. *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 249 n.7 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

Because ultimate liability in tort is not a jurisdictional fact and the merits of the cause are not at issue, the jurisdictional inquiry focuses on whether plaintiff sufficiently established facts suggesting that the defendant should have anticipated being haled into a Texas court based on her actions. *See Ennis v. Loiseau*, 164 S.W.3d 698, 708–09 (Tex. App.—Austin 2005, no pet.); *Wright*, 137 S.W.3d at 246, 251. "Hence, if the evidence suggests that the nonresident [defendant] officer participated in tortious or fraudulent activities, which were directed at Texas and for which [she] may be held personally liable, then there is a sufficient basis to assert specific jurisdiction over [her]." *Ennis*, 164 S.W.3d at 709 (citing *Wright*, 137 S.W.3d at 251). If the plaintiff pleads sufficient jurisdictional allegations, the nonresident defendant assumes the burden of negating all bases of jurisdiction in the allegations. *Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 574.

## B.     *Delgado's Alleged Torts of Fraudulent Inducement and Fraud*

Proppant Solutions has sued Delgado personally for fraudulent inducement and fraud in the performance of the ChrisDel/Proppant Solutions Contract, which occurred in material part in Texas. It does not allege that the contract was negotiated or signed in Texas. However, Proppant Solutions alleges that Delgado personally made material misrepresentations about ChristDel's experience and contacts procuring proppant in China to induce Proppant Solutions to sign the ChristDel/Proppant Solutions Contract. Proppant Solutions also alleges that

13

Delgado personally oversaw part of the contract's performance in Texas and that she directed telephone calls, emails, and fraudulently inflated invoices into Texas in furtherance of the performance of the fraudulently induced contract.

Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001); *Clark v. Power Mktg. Direct, Inc.*, 192 S.W.3d 796, 799 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Thus, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. *Haase,* 62 S.W.3d at 798–99. The operative facts of a fraudulent inducement claim are thus those that establish the elements of fraud with relation to the agreement between the parties.

The elements of fraud are: (1) that the speaker made a material misrepresentation (2) that he knew was false when he made it or that he made recklessly without any knowledge of its truth and as a positive assertion (3) with the intent that the other party act upon it and (4) that the other party acted in reliance on the misrepresentation and (5) suffered injury thereby. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). Fraud may also occur when (1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the

14

party intends to induce the other party to take some action by concealing or failing to disclose the fact; and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001); *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 408 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). A representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy*, 341 S.W.3d at 337.

Silence also may be equivalent to a false representation when the particular circumstances impose a duty on the party to speak and the party nevertheless deliberately remains silent. *Bradford*, 48 S.W.3d at 755; *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995). Whether a duty to disclose exists is a question of law. *Bradford*, 48 S.W.3d at 755.

Texas law provides that a corporate employee is personally liable for her own fraudulent or tortious acts which she directs or participates in during her employment. *See Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002); *Leyendecker & Assocs., Inc., v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984); *Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App.—Dallas 2007, no pet.).

**Analysis of Delgado's Texas Contacts Based on Pleadings of Fraudulent Inducement and Fraudulent Performance of Contract**

I would hold that Proppant Solutions has established that Delgado had minimum contacts with Texas in that she purposefully availed herself of the forum for the purpose of conducting activities within it and that Proppant Solutions' allegations of fraud and fraudulent inducement against her arose out of her contacts with Texas. Therefore, Delgado is subject to personal jurisdiction in Texas for doing business in Texas within the scope of Texas's long-arm statute by committing a tort in whole or in part in Texas. *See* TEX CIV. PRAC. & REM. CODE ANN. § 17.042. I would also hold that the Texas courts' exercise of jurisdiction over Delgado in the underlying proceedings comports with fair play and substantial justice.

## A.     *Delgado's Minimum Contacts with Texas*

To establish Delgado's minimum contacts with Texas, Proppant Solutions was required to show that she purposefully availed herself of the forum by conducting activities in Texas and that there was a substantial connection between her contacts with Texas and the operative facts of the underlying litigation. *See Moki Mac*, 221 S.W.3d at 576, 579 (specific jurisdiction requires satisfaction of "two co-equal components": privilege of conducting activities in Texas and substantial connection between contacts and operative facts of litigation). In the context of its allegations of fraudulent inducement and fraud, that means that

16

Proppant Solutions had to adduce pleadings and evidence suggesting that Delgado participated in tortious or fraudulent activities that were directed at Texas and for which she may be held personally liable. *See Ennis*, 164 S.W.3d at 709; *Wright*, 137 S.W.3d at 251. I would hold that Proppant Solutions fully carried its burden.

The undisputed facts in the record show that Delgado, as a director and the financial officer of ChristDel, participated in negotiating the ChristDel/Proppant Solutions Contract, which was to be performed in material part in Texas, where the oil field proppant was to be received, stored, transported, and delivered to EOG by ChristDel. Proppant Solutions has alleged that, during the course of these negotiations, Delgado, along with the other owners and principals of ChristDel, made material misrepresentations about ChristDel's experience and contacts in China, which they all knew were false when made, with the intent that Proppant Solutions act upon them and enter into the contract with ChristDel. Proppant Solutions has further alleged that it acted in reliance on the misrepresentations and that it suffered millions of dollars in injuries due to the misrepresentations of Delgado and others. The jurisdictional evidence also suggests that Delgado was personally involved in performing the contract, including traveling to Texas to meet with EOG representatives; directing multiple emails and phone calls to Texas for the purpose of arranging transport and financing for receiving, storing, and

delivering the proppant in Texas; and sending allegedly fraudulent invoices to Hall at his home office in Texas.

I would hold that Proppant Solutions alleged facts sufficient to establish that Delgado, whether by making affirmative misrepresentations or by remaining silent when she had a duty to speak, participated in the fraudulent inducement of a contract to be performed in material part in Texas and directed fraudulent invoices to Texas. It alleged that each corporate defendant, including Delgado, concealed or failed to disclose material facts within their knowledge about the experience and contacts of ChristDel with proppant suppliers in China and the cost of the proppant, knowing that Proppant Solutions was ignorant of these facts and did not have an equal opportunity to discover the truth, and intending to induce Proppant Solutions to sign the contract by concealing or failing to disclose these facts, to the injury of Proppant Solutions. *See Bradford*, 48 S.W.3d at 754–55; *JSC Neftegas-Impex*, 365 S.W.3d at 408. In my view, these particular circumstances imposed a duty on all of the ChristDel parties to disclose facts and, therefore, the silence of any ChristDel party, including Delgado, during these negotiations in which material misrepresentations within their knowledge were made was equivalent to making the false representations. *See Bradford*, 48 S.W.3d at 755; *SmithKline Beecham Corp.*, 903 S.W.2d at 353.

There is no question that the act of negotiating a contract to be performed in large part in Texas was a purposeful act by which all of the participants, including Delgado, a principal of ChristDel, sought profits on the contract, which could be obtained only by ChristDel and its principals' creating ongoing logistics operations with Proppant Solutions and EOG in Texas. *See Michiana*, 168 S.W.3d at 786 (stating that in establishing purposeful availment, only defendant's contacts with forum state count; "the acts relied on must be 'purposeful' rather than fortuitous"; and "defendant must seek some benefit, advantage, or profit by 'availing' [herself] of the jurisdiction").

As stated by the United States Supreme Court in *Travelers Health* and the Texas Supreme Court in *Michiana*, "Sellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." *Id.* (quoting *Travelers Health*, 339 U.S. at 647, 70 S. Ct. at 929). It was not necessary that Delgado's participation in the contract negotiations actually have occurred in Texas so long as the negotiations were purposefully directed to inducing a contract to be performed in large part in Texas. *See SITQ E.U.*, 111 S.W.3d at 646 ("[A] defendant should reasonably anticipate being haled into court where the effects of [her] conduct have been intentionally caused through that purposeful direction of

19

activity toward the forum state, even if the defendant never physically enters the state.").

In addition, the record plainly shows that, once the ChristDel/Proppant Solutions Contract was made, Delgado was a principal figure in its performance in Texas. In accordance with the terms of the ChristDel/Proppant Solutions Contract, and in exchange for sums agreed on in that contract, ChristDel arranged for the receipt of many tons of ceramic proppant in China and for its transportation to the Port of Houston in monthly shipments delivered over a period of eighteen months. ChristDel stored the proppant in its warehouse in Houston as necessary to meet the purposes of the Proppant Solutions/EOG Agreement. ChristDel arranged for the transportation of the proppant through Texas under arrangements made by Proppant Solutions and itself with EOG, and it delivered the proppant to EOG at its ultimate destination in Pleasanton, Texas.

Delgado helped organize the receipt of the proppant in Houston, and she arranged for trucks to deliver it to Pleasanton. She exchanged numerous emails and telephone calls with Hall, Proppant Solutions' co-owner and representative in Houston, arranging the logistics of the transportation and dealing with financing and billing. She personally visited Texas to review the operations with Proppant Solutions and EOG, and she sent the allegedly fraudulent invoices to Hall in Houston for payment.

20

I can only conclude, on the basis of these facts, that Delgado's contacts with Texas in connection with the negotiation and performance of the ChristDel/Proppant Solutions Contract are substantially connected to the operative facts of the litigation and show that she clearly purposefully availed herself of the privilege and benefits of conducting business in Texas under a contract from which she personally profited. There is a substantial connection between Delgado's Texas contacts, considered collectively, and the operative facts of the litigation. *See Dodd*, 426 S.W.3d at 286; *SITQ E.U.*, 111 S.W.3d at 646. Proppant Solutions presented facts suggesting that Delgado directed fraudulent activities—for which she can be held personally liable—at Texas, such that she should have anticipated being haled into court here based on her actions. *See Ennis*, 164 S.W.3d at 708–09; *Wright*, 137 S.W.3d at 248, 251; *see also Wechter*, 683 S.W.2d at 375 (holding that corporate employee or officer is personally liable for her own fraudulent or tortious acts that she directs or participates in during her employment).

I would hold that Proppant Solutions has borne its burden of establishing the minimum contacts prong of the Texas courts' personal jurisdiction over Delgado with respect to the activities made the subject of this litigation.

**B.     Fair Play and Substantial Justice**

There is also no question, to my mind, that subjecting Delgado to personal jurisdiction in this case comports with fair play and substantial justice, whereas

21

allowing her—alone among the principals of ChristDel—to escape trial and potential liability for her own alleged acts of fraud or fraudulent inducement shown to have a substantial connection with the operative facts of this case, as the majority opinion does, denies fair play and substantial justice not only to Proppant Solutions but to all the other parties. *See Guardian Royal Exch.*, 815 S.W.2d at 231 (listing five factors in establishing fair play and substantial justice: (1) burden on defendants; (2) interests of forum state in adjudicating dispute; (3) plaintiff's interest in obtaining convenient and effective relief; (4) interstate judicial system's interest in obtaining most efficient resolution of controversies; and (5) shared interest of states in furthering fundamental, substantive social policies).

First, the financial burden on Delgado of litigating this dispute in Texas—where litigation is already underway and all other defendants have submitted to jurisdiction and appeared and answered, where the contract was principally performed, and where over $59 million in business was done, including $6.5 million in profits generated from Proppant Solutions—is not excessive compared to the total burden on the parties imposed by the costs of the litigation. By contrast, allowing Delgado alone to avoid trial and potential liability increases the burden on all the other parties. It means either that the case must be tried elsewhere, where all defendants are subject to personal jurisdiction, or that Delgado alone must be allowed to escape trial and potential liability for any torts

she may have committed or participated in committing during the inducement and performance of the ChristDel/Proppant Solutions Contract, or that Proppant Solutions must bring suit against Delgado alone in Tennessee, thus creating piecemeal litigation and increasing the burden of costs and potential liability on all other defendants.

Second, Texas has a vested interest in adjudicating this dispute. The ChristDel/Proppant Solutions Contract expressly provides that the contract shall be "construed and interpreted in accordance with laws of the State of Texas," and any action "brought hereunder" is subject to venue in Harris County, Texas. Houston is the venue in which Proppant Solutions is afforded the most convenient and effective relief. It has an office here and Hall, a Texas resident, is a 40% owner of it. Likewise, Juan Delgado, one of the other defendants, is a Texas resident.

Third, ChristDel, of which Emma Delgado is a corporate director and owner, has already filed an answer in this action, as has Marc Delgado, another defendant and ChristDel co-owner and director, who is also a Tennessee resident.

Fourth, under these circumstances, the most efficient resolution of the controversy demands that Emma Delgado be subjected to personal jurisdiction in Texas, to which her co-defendants have voluntarily submitted.

Finally, resolution of the entire controversy in this Texas litigation comports with the shared interest of both Tennessee and Texas in furthering fundamental,

substantive social policies, and no one has presented any argument or evidence to show that it does not.

For all the foregoing reasons, I would hold that Emma Delgado is subject to specific personal jurisdiction in this litigation arising out of her alleged commission of the torts of fraudulent inducement and fraud in the performance of the ChristDel/Proppant Solutions Contract and that subjecting her to the jurisdiction of the Texas courts fully satisfies the constitutional requirements of fair play and substantial justice. I would, therefore, deny her special appearance and remand this case for trial on the merits.

## Response to the Majority's Jurisdictional Analysis

In my view, both the majority's reasoning and its holding that Delgado is not subject to personal jurisdiction in Texas on the facts of this case are deeply flawed.

First, the majority fails to recognize the distinction between establishing personal jurisdiction over a defendant in a stream of commerce case and establishing personal jurisdiction over a defendant in a fraud and fraudulent inducement case brought with respect to the negotiation and performance of a contract between and among sophisticated businesses in furtherance of interrelated agreements among them. Consequently, it incorrectly relies on *Michiana*, a general "stream of commerce" case, and *Moki Mac* as controlling authority. Neither is

24

relevant to the determination of the Texas courts' jurisdiction over Delgado in this litigation.

Second, the majority maintains that "Emma's participation in contract negotiations was not a purposeful contact with Texas." This claim is unsustainable under the facts of this case for the reasons set forth above.

Regarding the majority's reliance on stream of commerce cases, the majority claims that "a defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous.'" Slip Op. at 12 (citing *Michiana*, 168 S.W.3d at 785). The majority recites the facts in *Michiana*—a phone call placed by the Texas plaintiff to Michiana, a factory outlet for Coachmen RVs that had placed its RVs in the stream of commerce resulting in the plaintiff's purchase of an RV, and Michiana's shipment of the RV to Texas, which the Texas Supreme Court held insufficient to establish personal jurisdiction over Michiana. The majority then takes these entirely disparate facts as the authority for its *own* finding, on the facts of this wholly dissimilar case, that Delgado had no purposeful contacts with Texas. Slip Op. at 12–13 (citing *Michiana*, 168 S.W.3d at 781, 784, 788–92). There is simply no relationship between the operative jurisdictional facts in *Michiana* and the operative jurisdictional facts in this case.

Despite the majority's recitations, neither the ChristDel/Proppant Solutions Contract nor the Proppant Solutions/EOG Agreement that it incorporated reflected

25

the "mere sale of a product to a Texas resident." *See* Slip Op. at 13 (citing *Moki Mac*, 221 S.W.3d at 577). Proppant Solutions' claims against Delgado are not mere contract claims based on a product ChristDel launched into the stream of commerce and Proppant Solutions happened to purchase in Texas, as in *Michiana*. Proppant Solutions' claims against Delgado are are tort claims based on Delgado's own tortious participation in negotiating and performing a set of interrelated contracts among sophisticated business entities. Proppant Solutions has argued— and produced jurisdictional evidence—that Delgado participated in the torts of fraudulent inducement and fraud in the performance of a contract she and the other principals of ChristDel negotiated with Proppant Solutions and performed in principal part in Texas.

According to the record, Delgado's substantial personal involvement and conduct in both the inducement and the performance of the ChristDel/Proppant Solutions Contract were directed specifically at Texas. She allegedly made fraudulent misrepresentations with the intent of inducing Proppant Solutions into the contract, which was to be performed in large part in Texas, and she visited this state in furtherance of the performance of that contract. She made multiple phone calls and sent multiple emails to this state to perform ChristDel's contractual obligations. She arranged to receive the proppant at the Port of Houston, to store it in Houston, to transport it across the state of Texas, and to deliver it to EOG, a

26

Texas business. Finally, she sent allegedly fraudulently inflated invoices for ChristDel's performance of its contractual duties to Hall in Texas. The majority's reliance on stream of commerce cases like *Michiana* and *Moki Mac* can thus only be construed as entirely misplaced in light of these facts.

The majority's reliance on the wrong law also leads it to misconstrue the significance of Delgado's allegedly tortious actions in and directed to Texas to the proof of Proppant Solutions' claims. The majority concludes that ChristDel and its principals did not intend to direct their activities toward Texas. But this conclusion is completely at odds with the facts in the case. This is not a case in which Proppant Solutions complains that ChristDel placed advertisements in the stream of commerce directed to the general public and Proppant Solutions answered the ad and bought ChristDel's product. Yet the majority focuses entirely on ChristDel's marketing of its services to the public to the *exclusion* of any reference to the acts—either of contract negotiation or of contract performance—that Proppant Solutions alleges were committed by Delgado, were tortious, and were directed at Texas. Thus it concludes, incorrectly, that the reasoning of steam-of-commerce cases, such as *Michiana* and *Moki Mac*, is applicable to the determination of the Texas courts' jurisdiction over Delgado in this case. Slip Op. at 15–16. Consequently, it omits as irrelevant to its determination virtually all of the acts Proppant Solutions alleges Delgado committed in connection with the

27

alleged fraud that were specifically directed to Texas. And, in so doing, it disregards Delgado's participation in the operative facts of the litigation. Or it mentions these facts only to state that they do *not* show what they *do* show when construed in terms of what Proppant Solutions was required to prove to establish personal jurisdiction over Delgado under the facts of this case.

Dismissing Delgado's acts from consideration on the ground that she never attempted to market herself to Texas and had "no self-initiated contacts with Texas," the majority ignores Delgado's exchange of emails and phone calls to Texas to discuss financial and logistical matters, her arrangement of transportation, her review of the Texas facilities, her mailing of allegedly fraudulent invoices to Hall in Texas, and her receipt of millions of dollars in payments from Proppant Solutions. It then opines that Delgado's "only contacts with Texas were, much like in *Michiana* . . ., because a customer with ties to Texas contacted her Tennessee employer," and "Proppant Solutions actively recruited ChristDel and its personnel, not vice versa." Slip Op. at 15.

The majority also makes the factually incorrect claim that Delgado's coordination of the movement of proppant from the port of Houston to Pleasanton is insufficient "to establish purposeful availment" of the forum, Texas. Slip Op. at 19–20. And it makes the factually and legally incorrect claim that Delgado's visit to EOG's Pleasanton facility is not substantially related Proppant Solutions's

28

claims against Delgado and "cannot support special jurisdiction over Emma because no alleged liability arises from or is related to it." Slip Op. at 20.

The majority cites *Kelly* for support of its opinion. However, *Kelly* is a factually inapplicable personal jurisdiction case in which a Texas subcontractor on a hotel renovation project filed claims for third-party breach of contract, violations of the Texas Trust Fund Act, and fraud against the Arizona general contractor that had hired it. *Id.* The supreme court held that personal jurisdiction was lacking because, although the subcontractor had alleged two claims of wrongdoing, it had not alleged that any acts giving rise to those two claims occurred in Texas. *Id.* Here, by contrast, Proppant Solutions has alleged, in support of its allegations of fraudulent inducement and fraud, that Delgado directed numerous allegedly tortious activities to Texas, including making fraudulent misrepresentations to induce Proppant Solutions to enter a contract that was to be performed in large part in Texas and performing the obligations of that contract, including sending the allegedly fraudulent invoices to Texas.

## Conclusion

Because I believe the majority opinion fails to recognize the operative facts and controlling law of this personal jurisdiction case and misconstrues or misapplies the law governing personal jurisdiction, including constitutional standards of fair play and substantial justice, I must dissent.  I would reverse the judgment of the trial court finding that the Texas courts lack jurisdiction over Delgado in this litigation, and I would remand the case for trial against all defendants on the merits.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Brown.

Keyes, J., dissenting.